Dodd, et al. *v.* City of Jackson, Miss.

No. 41491          March 7, 1960          118 So. 2d 319

374

*Watkins & Eager, Thomas H. Watkins,* Jackson, for appellants.

*E. W. Stennett, William Neely, Watkins, Pyle, Edwards & Ludlam,* Jackson, for appellee.

Lee, J.

The governing authorities of the City of Jackson, acting under the provisions of Sec. 3374-10, Code of 1942, Rec., by an ordinance entitled ''An Ordinance to enlarge, extend, modify and define the corporate limits and boundaries of the City of Jackson, Hinds County, Mississippi'', on February 14, 1959, sought to annex approximately 23 square miles of territory, adjacent to the existing corporate area of approximately 27 square miles, and exclude therefrom approximately 137 acres, which

was being developed as a part of a lake and recreational facilities on Sixteenth Section land, partly within and partly without the City, under a program which was promoted by Hinds County. Sec. 1 of the ordinance described the territory to be included. Sec. 2 thereof described the territory to be excluded, and the reason therefor, to-wit: ''Public convenience and necessity can best be served by not having divided authority between the City of Jackson and Hinds County for safety, health and police protection on the properties utilized by the Sixteenth Section development corporation in the construction of said lake and recreational facilities.'' Sec. 3 contained a description of the corporate limits and boundaries as enlarged, modified by the exclusion, and fixed by the ordinance. Sec. 4 set forth the improvements that the City obligated itself to make in the annexed territory, within a reasonable time and not to exceed five years. Sec. 5 enumerated the municipal or public services that the City would render to the annexed territory, beginning on the effective date of the ordinance. Sec. 6 directed the filing of a petition with the Chancery Court of the First Judicial District of Hinds County for the ratification, approval and confirmation of the enlargement and modification of the boundaries as fixed and determined therein.

Pursuant to the command of the ordinance, and in conformity with Sec. 3374-11, Code of 1942, Rec., the petition, with a copy of the ordinance attached, was filed in the said chancery court on March 16, 1959; and the court fixed April 21, 1959, as the date of the hearing. Process was issued, as required by law, and on or before the return date, objections were filed by a number of citizens and taxpayers from several parts of the added territory, classified into 14 separate areas and numbered from 1 to 14, inclusive. These objections raised issues both as to the validity of the ordinance, and as to the reasonableness of the expansion. No objection to the proposed exclusion was filed.

At the conclusion of the hearing, the court overruled the objections to the validity of the ordinance. There was a finding of fact and an adjudication that Areas 1 to 11, inclusive, should be annexed, but that there should be excluded from the territory, as proposed in the ordinance, approximately 3.83 square miles, in the north-northeast section, namely, in Areas 12, 13 and 14, thereby fixing the extent of the expansion at approximately 19.17 square miles. The court further adjudicated that the grounds set forth in Sec. 2 of the ordinance for the exclusion of the territory therein described were reasonable, and that public convenience and necessity can best be served by not having those lands within the corporate boundaries of the City. The decree, in all respects, complied strictly with Sec. 3374-13, Code of 1942, Rec., and the corporate boundaries, set forth in the petition and ordinance exhibited thereto, as modified, were found to be reasonable and required by the public convenience and necessity, and were ratified, approved and confirmed, with the description thereof being set out in the final decree. From that action of the court, only R. H. Elliott and Mrs. V. R. Dodd, individually, and as members of Northeast Hinds County Homeowners' Association, appealed.

As a general proposition, the appellants assigned as error, and maintain in their brief and argument that (1) an annexing ordinance may contain only one subject, and that, since the ordinance in this case provides both for the expansion and the contraction of the city limits, it contains two subjects, and is invalid. They say furthermore that (2) the subject of the ordinance is not clearly expressed in its title, as required by Sec. 3374-74, Code of 1942, Rec., in that it gives no indication as to improvements and services to be furnished, and that it is therefore void. In addition, they also say that (3) the ordinance is void because it fails to pass upon the question of public convenience and necessity of the proposed extension.

■■ It is true that, under Sec. 3374-74, supra: "An ordinance shall not contain more than one subject, which shall be clearly expressed in its title; * * *" This statute has existed in its present form since 1892. See Sec. 3008, Code of 1892. The requirement of the statute has been held to be mandatory. Home Insurance Company v. Dahmer, 167 Miss. 893, 150 So. 650.

But the Legislature, by Chap. 491, Laws of 1950, which embraces seven different Articles and 174 Sections, provided for the creation, enlargement, and abolition of municipalities; prescribed the forms of government and the officers thereof and for the election of such officers; specified the powers and duties thereof; and repealed all laws in conflict therewith. This chapter now appears as Secs. 3374-01 to 3374-174 inclusive of the Code of 1942, Rec.

Sec. 3374-10 thereof, after declaring in the first sentence that "The limits and boundaries of existing cities, towns and villages shall remain as now established *until altered* in the manner hereinafter provided", then proceeds to say in the next sentence: "When any municipality shall desire to enlarge or contract the boundaries thereof by *adding thereto* adjacent unincorporated territory *or excluding therefrom* any part of the incorporated territory of such municipality, the governing authorities of such municipality shall pass *an* ordinance defining with certainty the territory which it is proposed *to include in or exclude from* the corporate limits, and also defining the entire boundary as changed." (Emphasis supplied.)

Obviously the subject with which the above statute deals is that of altering the limits and boundaries of existing cities, towns and villages. It would seem to be an absurdity if a city, in order to accomplish the purpose of altering its boundaries by adding certain adjacent territory and excluding certain territory already included within the existing limits, would be required to

adopt two different ordinances, and thus initiate at the same time two different proceedings in the chancery court.

In Ocean Springs v. Green, 77 Miss. 472, 27 So.. 743, the title to the ordinance under review was "An ordinance entitled an ordinance to prevent the carrying or exhibiting deadly weapons," and it was held that the subject of that ordinance was "deadly weapons, or of criminal acts committed with deadly weapons, and any and all acts committed by the use of deadly weapons which the municipality may choose to prohibit, might have been properly included under said title." In other words, while the ordinance did not include the exhibition of a pistol in a rude, angry and threatening manner, not in necessity self-defense, as a violation of the ordinance, the offense for which the appellant had been convicted, it could have done so under that title and would not have been in violation of Sec. 3374-74, supra. It was likewise held in Winfield v. City of Jackson, 89 Miss. 272, 42 So. 183, that: "An ordinance providing that all offenses made misdemeanors under the state laws shall be violations of the municipal laws contains only one subject, under Sec. 3008, Ann. Code 1892," now Sec. 3374-74, supra.

The title of the ordinance has been set out hereinabove. It contains the verbs "enlarge", "extend", "modify" and "define." The first two clearly authorize the inclusion of adjacent territory. Some of the definitions of "modify" are "to limit; to mitigate; to reduce in extent or degree; to moderate; to lower; to change somewhat the form or qualities of; to alter somewhat; change." Webster's New International Dictionary, 2d Ed.

The subject of the ordinance, namely, both the enlargement, to include adjacent territory, and the contraction, to reduce in extent the existing boundaries, is clearly expressed in the title, as hereinabove stated.

■■■ In the third sentence of Sec. 3374-10, supra, it is expressly provided that: "In the event the municipality desires to enlarge such boundaries, such *ordinance* shall in general terms describe the proposed improvements to be made in the annexed territory and the manner and extent of such improvements and the approximate time within which such improvements are to be made, and *such ordinance* shall also contain a statement of the municipal or public services which such municipality proposes to render in such annexed territory." (Emphasis supplied.) This quoted requirement is clearly mandatory, and the City, in its ordinance, must comply therewith. The promise as to improvements and public services and as to the extent and time within which they are to be made, by operation of law, had to be set forth. This condition precedent to the enlargement was fully met by Secs. 4 and 5 of the ordinance. ■■■ In other words, it was not necessary to include the City's obligation in the title of the ordinance, as one of the purposes thereof, because if the City expected to extend its corporate limits, the law required it to set forth this information only in the ordinance. Consequently the omission, from the title, of the City's promise as to improvements and services did not render the ordinance void.

■■■ In Richards v. Town of Magnolia, 100 Miss. 249, 56 So. 386, it was held: "If the title fairly gives notice of the subject of the ordinance, so as to reasonably give notice and lead to an inquiry into the body, that is all that is necessary." See also State, ex rel. Collins v. Jones, 106 Miss. 522, 64 So. 241.

■■■ So far as the extension of the limits was concerned, when the governing authorities adopted the ordinance to that effect, by that act they determined that the extension was required by the public convenience and necessity. Richie v. Brookhaven, 217 Miss. 860, 65 So. 2d 436, 65 So. 2d 832; Mrs. Louise Smith v. City of Meridian, Mississippi, 237 Miss. 486, 115 So. 2d 323; Harris

v. City of Newton, Mississippi, 238 Miss. 405, 117 So. 2d 199. The decree, after modification, followed the language of Sec. 3374-13 of the Code.

With reference to the contraction of the limits or the exclusion of the 137 acres in Sixteenth Section, the governing authorities expressly complied with the fourth sentence in Sec. 3374-10, supra, by setting forth in Sec. 2 of the ordinance "a statement of the reasons for such contraction and a statement showing whereby the public convenience and necessity would be served thereby."

The authorities, both from this and other jurisdictions, cited by the appellants, are of no substantial value in this particular case because the meaning of the statutes under consideration is clear and unambiguous.

The Court is, therefore, of the opinion that the general objections to the validity of the ordinance are without substantial merit.

The appellants, who live in that part of Area 13 east of New U. S. Highway 51, which includes subdivisions around the Colonial Country Club, while maintaining that the ordinance is invalid for the reasons heretofore stated, insist that, if they are mistaken in that contention, the inclusion of that area was wholly unreasonable. They say that the residents of that area are substantially removed from the City of Jackson and the built-up areas surrounding it; that they are not using and do not need and want any City services; and that they will be deprived of County school transportation for their children, road maintenance, private water companies, private garbage collection, and other benefits, which are superior to the same services rendered by the City. They maintain that, on account of the distance from the City, every service furnished will be more expensive, and that the City does not have the financial ability to furnish reasonable services and improvements within a reasonable time.

During the trial, the City offered 40-odd witnesses and the Objectors 50-odd. The record contains 48 volumes of pleadings and evidence, and over 400 exhibits. The recitation of even the gist of the evidence of each witness is unthinkable. Such an exposition would unduly prolong the opinion and require too much space. The Court must be content to state, as far as necessary, only the ultimate facts essential to a review and a final conclusion. In this connection, let it be said to the credit of learned counsel on both sides that they have filed excellent briefs, and thereby have greatly facilitated the work of the Court in its search for a fair and just determination of this highly complicated question.

The Court found it necessary and expedient to scrutinize carefully (1) the City's alleged need for expansion, (2) whether Area 13 is reasonably within the path of such expansion, (3) the potential health hazard from sewage and waste disposal in the Hanging Moss and Purple Creek drainage basin, (4) the City's financial ability to make the improvements and furnish municipal services as promised, and, weighing all of these considerations, (5) determine whether or not the trial court was in error in holding that the inclusion of the territory in Area 13, as designated, is reasonable.

THE CITY'S ALLEGED NEED FOR EXPANSION

The evidence depicted the history of the City's development from a mere hamlet with six families in 1822 until the present time. There has been a remarkable increase in population since 1920, when, with an area of 5.5 square miles, there were 22,817 people in the City. With an area of 15 square miles, the 1930 census showed the population to be 48,000. Without change in area, in 1940, 62,107 were enumerated. After an extension of boundaries in 1949 to embrace 27.2 square miles, the census of 1950 showed the population to be 98,271. During the last five decades, the number of persons per acre has been rela-

tively constant. Reasonably accurate estimates indicated that the present population, with the extended limits as proposed, will aggregate in excess of 154,000.

The consensus of expert opinion was that, for the period of 1960 to 1970, the increase in population will be the greatest of any decade in the history of the country. The large number of "war babies", born during and immediately following World War II, will become of marriageabls age, with the resulting formation of multiplied thousands of families. All of the reasonable indicia point to an increase in the population of the City and its environs, during the next ten years, of approximately 75,000 persons; and of this increase, approximately 13,000 to 14,-000 will be settled within the north-northeast area.

## WHETHER AREA 13 IS REASONABLY WITHIN THE PATH OF SUCH EXPANSION

At the instance of the City, W. Merle Mann, whose business is that of real estate, realtor, mortgage banker and real estate appraiser and counsellor, with 21 years of experience, made a detailed and comprehensive study to determine the reasonable amount of land to be annexed for the City's land use from 1960 to 1970. It was found that Pearl River constitutes an obstacle to expansion to the east, and any expansion would have to occur in the sections to the south and southwest and to the north and northeast. The considerations which he dealt with were: (a) Potential number of residential lots available in the City; (b) The degree of development in the annexed territory at the time of the survey; and (c) The terrain thereof with a determination as to the wasteland when it is subdivided. He found that at least 7,900 homes had been built in the City and its immediate environs during the past five years. The percentage of houses in the field of their relative value was as follows: Under $10,000, 7%; $10,000 to $13,000, 31%; $13,000 to $15,000, 23%; $15,000 to $20,000, 24%; and

$20,000 and upward, 15%. The reasonable cost of lots for houses in the above-described divisions was, respectively: (1) $800 to $1,200; (2) $1,300 to $1,500; (3) $1,600 to $2,000; (4) $2,100 to $3,000; and (5) $3,000 to $6,000. Only about 1,000 lots were then available within the City limits, and it was anticipated that approximately 16,000 houses will be needed during the next ten years. Consequently approximately 15,000 lots will be needed outside the present limits. His study embraced the whole of the territory sought to be added, namely, Areas 1 to 14, inclusive, and he was of the opinion that about 7,080 of the needed 15,000 lots would be required in the north-northeast area which embraces Areas 10 through 14, inclusive. Of the 752 single family White housing units, which had been built in the five-month period from January to May 1959, 90.9% had been constructed outside the City. As to Area 12, after deductions on account of overflow, and public, semi-public, school and church uses, due to the trends in that area, the lots running 100 x 200 feet, there will be about 1½ lots to the acre, and thus produce 3,333 lots. By actual count, 733 lots therein have been improved, leaving 2,600 available.

In Area 13, after deductions for acreage subject to overflow, for commercial purposes and for public and semi-public use, there will be available for residential, development 1,225 acres. Using 2½ lots to the acre will produce 3,062 lots. By actual count, 575 have been improved. Consequently the net maximum increase available is 2,487 lots.

The potential of 857 lots in Area 14 was eliminated because that area was excluded by the Chancellor. There was only a small number of available lots in Area 10.

The witness was also familiar with land values in Area 13, and he testified that, during the past year, the prices offered and paid showed an increase in value of 20% to 50%. In his opinion, the trends indicated that the land

in the north-northeast area would be put strictly to urban development, that is, residential, industrial and commercial use.

Col. Battle M. Barksdale, a witness for the City, testified that, in January 1959, there were 530 single family residences, 15 commercial structures, and 3 churches situated in this area; and that, on April 23, 1959, the number of such residences had increased to 670.

A. Y. Harper, a witness for the Objectors, admitted that this area was being built up, and he named several contractors, who were constructing homes there.

W. P. Bridges, Sr., an experienced realtor, a witness for the Objectors, admitted that 10 or 12 real estate developers were building houses in Area 13 at the time of the trial. In his direct examination, he was asked as to the value of the land in that area, including the most and least expensive, and he replied "around $1,200 an acre." He said that "The value varies anywhere from the swampland at three to four hundred dollars an acre up * * *" He said the maximum price was along the new highway, where "all of the recent sales have been made at approximately $100.00 a front foot, some a little higher up nearer Northside Drive at around $200.00, 'til you get out beyond Hanging Moss Creek at $100.00 a front foot. That's for about a 500-foot depth." He said that this "takes you up to an eight to ten thousand dollar per acre valuation. For residential use, it's selling at from $2,000 to $3,000 an acre when it's susceptible to development. The swampland would sell for $250 to $400, depending on the extent and the frequency with which it is flooded. So it's just difficult to take an average without just sitting down and making a careful analysis." He thought that $1,200 an acre was too high for grazing land, but that the owners would graze cattle on it until there was a demand—all houses could not be built at once.

Jack Patridge, advertising director for Underwood Homes, a witness for the Objectors, while introducing 20-odd photographs, which were calculated to show this area as being wild land, on cross-examination, admitted that in one of these pictures, made on April 13, 1959, in which cattle were shown to be grazing, in fact, on the day when he was testifying, the land was being developed, the fences had been torn down, the streets had been graded, and buildings were being erected on that particular spot.

For the appellants, W. P. Bridges, Sr. estimated that only 12 to 13 per cent of Area 13 north of Hanging Moss Creek and east of new U. S. Highway 51 is now developed, meaning that houses are built or the streets, curbs and gutters are completed, and that it will take 10 to 15 years to complete. He was of the opinion that the erection by Pearl River Valley Water Supply District of the proposed dam over Pearl River north of the City and the formation of a reservoir for water supply and other purposes will retard this development because there will be a considerable number of lots for lease around the Reservoir. It will cost the City a tremendous sum of money to provide the municipal services, and will necessitate an increase in millage. He said that it costs developers about 25% more to do their job on the inside than on the outside of the corporate limits and that the cost of a house itself is 5% to 7% more. In previous expansions, he thought that territory was taken into the limits only when it was about 50% developed. Since FHA and Veterans Administration requirements are about as rigid as those of the City, and there are county zoning and planning boards, he thought the danger of faulty and inferior streets and construction was slight. The effect of this evidence was that the area is not developed sufficiently to be taken into the corporate limits.

J. Will Young, a long time resident of the City, and a lawyer, who has served on the Planning Board, was also

of the opinion that too much area was being included in the north-northeast area; and that there was too little development between the existing limits on the north and the Colonial Country Club area. He admitted that there had been considerable development in the area, and that a number of developers were operating there. He did say, however, that, in the 1949 expansion, some of the included areas were far less than 50% developed and that, in some instances, there were gaps of a mile or more.

The appellants, while conceding the ability of the witness Mann and the comprehensive nature of his study, insist that the City, under that study, will need only about 1,580 houses each year for the next five years, and that, with Areas 13 and 14 excluded, there will still be available, within the other areas, a sufficient number of lots, for the normal growth of the City during the next five years. Consequently they say that it is not reasonable to project the land use need of the City for a ten-year period.

THE POTENTIAL HEALTH HAZARD FROM SEWAGE AND WASTE DISPOSAL OF THE HANGING MOSS AND PURPLE CREEK DRAINAGE AREA.

There was much evidence in connection with the potential health hazard as a result of sewage disposal in the Hanging Moss and Purple Creek basin. Dr. A. L. Gray, the executive officer of the State Board of Health had been upon the ground and was amazed at the extent of the development. He found that a good per cent of sewage there goes through septic tanks and that the soil in the Jackson area is not adaptable to the satisfactory operation of this kind of disposal. He had inspected an Imhoff tank four or five weeks previously, and observed the sewage spilling over the top. He introduced photographs showing water and fluid coming from the tank

and with solid matter on the ground and in two drains to a ditch. The discharge was finding its way into Purple Creek. This was only one-fourth of a mile from the residential area. He was of the opinion that this kind of situation constitutes a health hazard. He also introduced a picture of a lagoon, the effluent from which is also discharged into Purple Creek. The trouble, in both instances, insofar as the City is concerned, was that the effluent and waste from these sources are discharging into Purple and Hanging Moss Creeks, and these streams empty into Pearl River two or three miles upstream above the City's water intake. In the doctor's opinion, this probably constitutes an additional health hazard for that reason. He said that there is a definite need for an overall plan for the collection and disposal of sewage within this drainage area to be annexed to the City.

Horace B. Lester, an engineer for the City, testified that the City, in 1945, began studies to analyze the development of every subdivision. The southern ridge of the Hanging Moss Creek basin had controlled the northeastern boundary of the existing corporate limits. An analysis determined that 18% of the outside development had occurred in that basin, and, in his opinion, for the next decade it will increase rather than merely equal other areas. He prepared several maps of that portion of the basin in the present expansion, with particular reference to topography, geography, and suitability for residential, commercial, industrial and civic purposes. The concern of the City was the collection, transportation, and disposal of sewage, and the protection of its raw water supply. The disposal of this waste should be made below the raw water intake at all times to prevent a health hazard. At this time it is not practical to do so by gravity, nor is it practical to dump the same below the intake as the outlet would be only six feet from the bottom of the river. However, he thought that the collection into a lagoon and the subsequent discharge

through outfall lines south of the present intake would be feasible; and by overall planning, this health hazard can be eliminated. The proposed sanitary sewage stabilization lagoon, as a facility in an overall plan for moving the sewage to a point below the raw water intake, following the design criteria used in the study of the basin, was approved by J. E. Johnston, Director of Sanitary Engineering of the State Board of Health, and by William L. Porter and Harvey A. Jones, of Independence, Missouri, sanitary engineers of wide experience in such type of disposal.

The appellants vigorously denied the feasibility of the lagoon system. They offered evidence to the effect that the location of the dam for the Reservoir has been moved up the River above the mouth of Culley Creek, which is contaminated by sewage and waste from the area of the Towns of Ridgeland and Madison, and which is not in the proposed corporate limits. Besides, the proximity of the Eubanks outfall sewer into the River, near the lowhead dam is now such that, in times of high water, sewage from that line can get into the present lowhead dam water intake. They further emphasized that an analysis of Lester's Exhibit, P. 75, calls for approximately 45 first stage lagoons; that his Exhibit, P. 74, shows fourth stage lagoons covering as much as 21 acres for a single one; and that the lagoons would be scattered over the northern part of the City, and involve an expense of around $4,000,000. They also offered evidence that the Missouri lagoon system, upon which so much reliance was placed by the City, during the summer of 1958, for the first time in four years, had developed blue-green algae, which resulted in material floating on the top of the water, with offensive odors. There was also evidence to the effect that FHA will not insure a mortgage on a home built within 500 feet of a sewage lagoon; and that 40 acres could not be developed around a 4-acre lagoon. J. Will Young, while conceding septic tanks to

be unsatisfactory, was of the opinion that the lagoon system was not feasible, that the cost would be prohibitive, and that a conduit direct from the Reservoir is the answer. Besides this, there was evidence to the effect that property values will be adversely affected.

The witnesses seem to have agreed, insofar as the City's water supply is concerned, that it would be better and safer to take the water from the Reservoir by conduit. The plans for the dam make provision for that eventuality. In that event, of course, pollution from the Hanging Moss and Purple Creek basin would be eliminted.

On this sharply disputed and highly controverted issue, the appellants, with great earnestness and much merit, say that, if Area 13 should be excluded from the expansion, the large amount of money necessary for the institution of the lagoon system could be devoted to treatment plants at each outfall sewer line so as to eliminate the dumping of raw sewage into the River, and that after approximately five years, when this area has developed to a reasonable extent, a conventional sewer line can be laid with a final treatment plant near the River.

## THE CITY'S FINANCIAL ABILITY TO MAKE THE IMPROVEMENTS AND FURNISH THE MUNICIPAL SERVICES, AS PROMISED

Prior to the passage of the ordinance, the governing authorities of the City had devoted considerable study to the proposition of expansion. They had created a Planning Board, composed of 35 men and women, and hired a full-time Director and staff. They had intensified their study for the preceding three years. An overwhelming majority of the Planning Board, present and voting, approved an expansion, substantially in conformity with the boundaries, which were fixed in the ordinance. It was shown that in 1949, the time of the last expansion, there was a deficit of over $85,000 in the general fund.

Notwithstanding this situation, the City had been able to render the services to the people affected in that instance. At the time of the passage of the ordinance, as contradistinguished from the previous expansion, the City had already completed and financed adequate facilities to furnish water for a quarter of a million people. Besides there was on hand and in unsold bonds in excess of $5,000,000, available toward the provision of fire and police protection, library, sanitary sewers, water, street lighting and other municipal services to the people of the City and in the annexed area. Too, there was a surplus in the general fund as of September 30, 1958, of $2,021,989.49, for immediate municipal services to the people in the City and in the annexed area. The assessed valuation of property within the City for 1948 was $91,903,412, whereas in 1958 this amounted to $220,782,438. The estimated assessed value of the property in the annexed territory was $40,524,900.

Insofar as ad valorem taxation was concerned, the levy for 1958 was 20.50 mills as compared to 19.75 mills in 1948. The Jackson Separate School District, a separate legal entity, has been working on a large school building program, with the result that the levy for school purposes has been increased to 22.00 mills in 1958 as compared to 12.25 mills in 1948. While the City had outstanding approximately $21,000,000 of bonds and other indebtedness, under the debt limitation of 15%, it still had a margin between $11,000,000 and $12,000,000. In like manner, the Separate school district lacked between $17,000,000 and $18,000,000 of reaching the allowable debt limitation status. It was further shown that the City has an excellent bond rating of BAA, in fact, the same as Hinds County.

In contrast to the picture of financial affairs, as presented by the witnesses for the City, A. N. Morgan, a certified public accountant, and witness for the appellants, testified that the City, on Sept. 30, 1949, when the

last expansion occurred, had outstanding general, street intersection, water works, and special assessment bonds in the amount of $9,041,500, whereas on February 25, 1959, it had outstanding and authorized for those purposes $27,233,000. School bonds of the Jackson Separate School District outstanding as of September 30, 1949, amounted to $745,000, whereas on February 25, 1959, there was outstanding and authorized for that purpose $21,047,000. By combining the overall bonded indebtedness of both the City and the Separate school district, he estimated that there has been a debt increase within the past ten years of approximately 393.43 per cent, with an estimated debt increase per person from $117.90 to $386.16. Also, under his estimates, the residents in the annexed areas will assume a per capita debt of $151.01. Along with this, there had been an increase from 32 to 42.5 mills. In addition, for several years, the City had been collecting a one-half cent sales tax, which produced about $1,000,000 a year, the equivalent of a 4.6 mill increase in ad valorem taxes. On his basis of the cost of operating the added area, he estimated that there would be an annual recurring cost item, and, on the basis of the expected tax revenue, the City would have an operating deficit each year of $584,363.20. By September 30, 1962, he said that the surplus in excess of $2,000,000 will be gone, and there will be a deficit of $420,001.23. He concluded that the expansion will necessitate a 10.29% increase in taxes for all property within the City.

It was shown that the City contemplated the erection of six new fire stations, one of the six having two rather than one company, and that the people, in the annexed area, would receive substantial reductions in their fire insurance rates. Actually the City had furnished fire protection to Area 13 for the last ten years, having answered 39 calls in that area.

The City's waterworks system was presently supplying water to a substantial number of residences in Area

13. The inclusion of this area will automatically reduce present rates one-half. Besides, the patrons of private companies will reap the same benefits.

The City water lines can be tied into the existing lines in the whole area, according to the City's estimates, for $734,525, and the City has entered into a contract to purchase the Hinds County Sewer System. Under the City's evidence, it will be able to make the improvements and furnish the services, which it has promised in the ordinance.

However, the witnesses, living in Area 13, who testified in opposition to the inclusion, with one accord, were satisfied with their present situation, including water supply, private garbage collection, road maintenance by the county, and police protection from the county authorities. While depending largely on septic tanks and lagoons, they were of the opinion that their disposal of sewage was sufficient and satisfactory. They were greatly concerned over the loss of transportation for their children to school. While these children will continue to attend the Jackson City schools, they will be required to ride the regular busses and pay therefor, or be transported by private conveyances. Some of them say that they would call the City fire department in case of a fire. In other words, these witnesses did not think that they needed the City services, and they believed that they will sustain a heavy increase in their tax bills without correspondent benefits.

The appellants emphasized the fact that the estimated cost to supply water for Area 13 was $245,137, or practically one-third of the total cost of estimated expenditures for this purpose, and that the anticipated gain in population in that area is only about 15,000. They further pointed out that, while the City had a contract of purchase of the named sewer system, there was no estimate as to the cost of it or other water and sewerage utilities. They also maintain that the figures on gar-

bage collection, while showing an increase of 50%, at the same time, showed an increase of 130% in the cost thereof.

(A) Beyond question, the evidence in this record showed that there is an urgent need for the expansion of the City's corporate limits.

(B) It is true that Area 13 constitutes a considerable territory. But it is clear that there are already substantial developments in that part of the proposed expansion, and that the area is building up rapidly. The trends indicate that it is attractive to would-be homeowners as well as for commercial and industrial enterprises. While there are gaps between the city limits and some of the areas under development, it appears that like situations existed in other expansions. While one experienced realtor testified that he always developed a subdivision more cheaply before it was taken into the corporate limits than after, and that the construction would be just as good without city control, his success does not necessarily establish a rule to that effect. Others might effect their profits by faulty construction. There is much merit in the theory of overall planning, namely, where it can be reasonably anticipated that a certain area will become a part of a city in a reasonable time, it is better to take it in and develop the same properly and wisely, with particular reference to a uniform system for securing water, the development of streets, and the collection and disposal of sewage and waste, rather than to let the area develop in a harum-scarum manner as each builder or developer may determine. Instances of the lack of uniform planning in laying out streets, water lines, and sewage disposal in the towns and cities can be seen on every hand. It must be borne in mind too that the final decree in fact excluded a large part of the territory in Area 13.

■■ The burden of proof was on the City to establish that the enlargement of its boundaries was reason-

able. In Re Extension of the Boundaries of the City of Indianola, 226 Miss. 760, 85 So. 2d 212; Spears v. City of Oxford, 227 Miss. 801, 87 So. 2d 61. ▮▮ Since the learned chancellor very properly excluded a large part of Area 13, the Court is of the opinion that there was substantial evidence before him, and he was fully warranted in finding that the inclusion of Area 13, as modified, was reasonable.

(C) Evidently if the effluent and waste from the septic tanks and the lagoons in Areas 12 and 13 are permitted to drain into Pearl River upstream from the City's raw water intake, there will be pollution of the City's water supply, which could result in a health hazard to those using such water. Obviously if the City's water can be taken by a conduit from the reservoir itself, the effluent from the Hanging Moss and Purple Creek basin will not be a source of danger to users of the City's water. Estimates as to the cost of the conduit system were somewhat fragmentary. But W. P. Bridges, Sr., President of the Reservoir Commission, testified that Lester Engineering Company gave the Commission an estimate of the cost of this construction as slightly more than two million dollars. The estimated cost of the lagoon system, as proposed by the City Engineer, was in excess of four million dollars. While, with the use of a conduit, the City's water users would not be affected from this effluent, at the same time, the discharge from septic tanks, as Dr. Gray testified, could constitute a health hazard to those living in that area. Thus the collection and disposal of sewage by the City in some feasible way must be accepted as one of the benefits of inclusion within the corporate boundaries and, as such, will therefore redound to the health and well-being of the people of the area.

(D) The City of Jackson and the Jackson Separate School District are two separate entities. Their boundaries do not coincide. However, a large majority of the people in the separate school district live within the cor-

porate limits, and the tax levies and debt loads of both entities fall upon them. So far as available funds are concerned, it appears that the City is in better financial shape to assume the expense of the present expansion than it was at the time of the 1949 expansion. Of course there has been a large increase in the cost of operation of both the City and the school district and in the bonded debt of both; but, at the same time, both have received considerable increases in revenue. People now demand more public services and, of course, in order to get what they demand, they must pay more taxes. The burden of taxation gets heavier and heavier year by year. But the City still maintains a high credit rating. Without going into any further detail, the Court is not in position to say that the chancellor, on this sharply disputed issue of fact, was in error in holding that the City is financially able to make the improvements and furnish the municipal services to which it has obligated itself.

(E) Having weighed all of the evidence and the arguments, pro and con, the Court is of the opinion that the learned chancellor had substantial evidence on which to approve, ratify, and confirm as reasonable in all respects the expansion, as modified, and that he was not in error in holding that the inclusion of the territory in Area 13, as designated, was reasonable.

From which it follows that the decree of the trial court must be, and it is, affirmed.

Affirmed.

All Justices concur, except *Roberds, J.,* who took no part.

## ON APPELLANTS' MOTION TO DISCHARGE THE $5,000 APPEAL BOND

The appellants, Mrs. V. R. Dodd and R. H. Elliott, to perfect their appeal to this Court, tendered to the chancery clerk separate bonds in the sum of $500 each, with

good and sufficient sureties, conditioned to pay all costs if the decree should be affirmed. But, because it was estimated that the costs would amount to more than $4,-000, the clerk, at the instance of the chancellor, disapproved the same and required a bond or bonds in the sum of $5,000. The tendered bonds were left in the file, and the appellants then complied with the requirements by tendering a third bond in the sum of $5,000.

The appellants contend that the statutes, for an appeal in this kind of case, do not require a bond in that amount; that it is void; and that it should be discharged and the sureties released.

Section 3374-14, Code of 1942, Rec., provides as follows: "If the municipality or any other interested person who was a party to the proceedings in the chancery court be aggrieved by the decree of the chancellor, then such municipality or other person may prosecute an appeal therefrom within the time and in the manner and with like effect as is provided above in the case of appeals from the decree of the chancellor with regard to the creation of a municipal corporation."

Now an appeal from a decree with regard to the creation of a municipal corporation is governed by Section 3374-08, Code of 1942, Rec., which is as follows: "Any person interested in or aggrieved by the decree of the chancellor, and who was a party to the proceedings in the chancery court, may prosecute an appeal therefrom to the supreme court within ten (10) days from the date of such decree by furnishing an appeal bond in the sum of five hundred dollars ($500.00) with two good and sufficient sureties, conditioned to pay all costs of the appeal in event the decree is affirmed. *Such appeal bond* shall be subject to the approval of the chancery clerk and *shall operate as a supersedeas.* If the decree of the chancellor be affirmed by the supreme court, then such decree shall go into effect after the passage of ten (10) days from the date of the final judgment thereon, and the party or

parties prosecuting such appeal and the sureties on their appeal bond shall be adjudged to pay all costs of such appeal.'' (Emphasis supplied.)

Obviously the two bonds, in the sum of $500 each, are insufficient to assure the payment of accrued costs in this appeal. But the appeal, as allowed by Section 3374-14, supra, is perfected under Section 3374-08, supra, by furnishing bond in the sum of $500, and it is further provided therein that such bond "shall operate as a supersedeas."

The chancellor was evidently acting under the provisions of Section 1162, Code of 1942, Rec., the applicable part of which is as follows: " * * * but in cases where supersedeas is not desired and the cost of transcript shall not be prepaid, if the clerk of the court or any party to the suit shall apprehend that the costs of the transcript of the record and of the appeal will exceed five hundred dollars, such clerk or party may apply to the court in which such suit shall have been decided, or to the judge or chancellor in vacation, and an order may be made by the court, judge, or chancellor, fixing the amount of such bond for costs of appeal.'' But that statute does not seem to have any application because it has reference to cases where supersedeas is not desired. Neither does Section 1163, Code of 1942, Rec., being the amount of bond required for supersedeas, have any application.

██ It may be that the legislature deemed that proceedings of this kind are matters of such public importance that great liberality should be extended in appeals in such cases. It can be seen that rank injustice might occur in the arbitrary inclusion of the property of a small taxpayer, and that he would be deterred from an appeal out of fear that he would lose all of his property on account of a large cost bill. It may be that the legislature did not foresee that costs might soar to such astronomical figures. Be that as it may, the statutes give an interested party the right to appeal on his furnishing a good

bond in the sum of $500, and to have such bond operate as a supersedeas. This Court cannot, by judicial construction, repeal them.

The chancellor had no authority to require bonds in excess of $500.

In Redus v. Gamble, 85 Miss. 165, 37 So. 1010, this Court said of the action of a justice of the peace that a party "cannot be deprived of his right of appeal by the trial judge arbitrarily or ignorantly demanding an appeal bond in a greater penalty than that authorized by the statute and refusing to approve a proper bond tendered in due time."

In 4A C. J. S., Appeal and Error, Section 561, page 277, it is said: "The refusal of the lower court to approve the appeal bond or undertaking is subject to appellate review."

██ ██ The next question is whether the obligors on the $5,000 bond should be held liable on their contract, voluntarily undertaken when they bound themselves to pay the costs in the event that the decree should be affirmed.

Now 5B C. J. S., Appeal and Error, Section 2034, page 671 says: "Usually a bond containing provisions or conditions more onerous than the statute requires is without consideration and void as to such more onerous provisions or conditions."

Since the two $500 bonds conformed to the statutes, they were sufficient to perfect the appeal; and the $5,000 bond must therefore be treated as surplusage and must be discharged, thereby releasing the sureties therefrom.

While the two bonds for $500 each are not sufficient to pay all costs, they stand good to the extent of $1,000; and under Section 3374-16, Code of 1942, Rec., "The costs incurred in the appeal shall be taxed against the appellant if the decree be affirmed."

The motion is therefore sustained, and the $5,000 appeal bond is discharged.

Motion sustained.

All Justices concur except *Roberds, J.,* who took no part.