# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-AN-01580-SCT

*IN THE MATTER OF THE EXTENSION OF THE*
*BOUNDARIES OF THE CITY OF WINONA,*
*MONTGOMERY COUNTY, MISSISSIPPI:  HARRY*
*NEAL, DONNA NEAL, SCOTT NEAL, HARRIET*
*NEAL AND WINONA ELEVATOR CO. INC.*

*v.*

*CITY OF WINONA, MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 8/28/2002 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JAMES H. HERRING |
| ATTORNEYS FOR APPELLEE: | JERRY L. MILLS |
| | RAYMOND M. BAUM |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 06/24/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.     This case involves an appeal from a chancery court ruling which approved the City of Winona's

annexation of certain parts of land located in Montgomery County and land known as the "Winona Elevator

Property."  On May 22, 2002, the City of Winona ("the City") filed a petition to ratify and confirm the

extension of its boundaries in the Chancery Court of Montgomery County, Mississippi.  The petition

proposed four areas to be added to the City, included in the petition to extend the boundaries was property owned by the Neal family. An answer of objectors was field on December 22, 2000 by Harry Neal, Donna Neal, Scott Neal, and Harriet Neal (collectively referred to as "the Neals") and Winona Elevator Co., Inc. (Winona Elevator).[1] The case was heard before the Honorable Percy L. Lynchard, Jr., presiding, on February 11-15, 2002. At trial, only members of the Neal family, both individually and as representatives of Winona Elevator, appeared to oppose the annexation.

¶2. The chancellor filed his opinion on May 13, 2002. In his opinion the chancellor determined that there was no objection to the annexation of three parcels of land, identified as Parcel One, Two and Three, respectively. Parcel Four contained land owned by the Neal family and Winona Elevator. For purposes of identification, the chancellor further divided Parcel Four into two sections described as the developed "Winona Elevator Property" and the "Undeveloped Neal Property." The opinion reflects that the chancery court found that under a totality of the circumstances the annexation of all the territory for which the City offered proof was reasonable *with the exception* of what the chancery court described as the "Undeveloped Neal Parcel." On August 28, 2002, the chancellor signed a final judgment approving the enlargement and extension of the boundaries of the City of Winona with the exception of the "Undeveloped Neal property." Following the final judgement and these proceedings, the Neals filed a timely appeal to this Court on September 13, 2002. The appeal only concerns the fourth section of land containing the "Winona Elevator Property," the other three sections of land annexed by the City are not at issue before this Court.

## STATEMENT OF THE FACTS

---

[1] Winona Elevator is a business owned by members of the Neal family.

2

¶3.     The City filed a petition for the annexation of four areas of Montgomery County into the City of Winona, which is also located in Montgomery County, Mississippi.  Of these four areas that the City petitioned to annex, only the ruling as to a portion of the property identified as "Parcel Four" is on appeal today.  The chancery court, in its opinion, described the area at issue as follows:

> Parcel Four - This parcel is located North of Highway 82 and West of Highway 51.  This property is referred to as the Neal Property.  For the purposes of this opinion and based on the proof presented this parcel is further divided into the developed **Winona Elevator Property** [FN 1] **and the Undeveloped Neal Property.**

(emphasis added).  The footnote to the description stated the following:

> [1] The Property referred to herein as the Winona Elevator Property includes includes (sic) property owned by others bordering US Highway 51 and is referred to as Winona Elevator Property only for convenience of identification.  The Undeveloped Neal Property includes the property owned by Mr. and Mrs. Scott Neal which lies North of US Highway 82 and west of the Winona Elevator property.  In addition it includes property of others to the west of the Neal property line.

Thus, the chancellor divided Parcel Four into what he described as the developed "Winona Elevator Property" and the "Undeveloped Neal Property."  The chancellor approved the annexation of all the areas with the exception of the property described as the "Undeveloped Neal Property."  In his opinion, the chancellor ruled:

> The indicia of reasonableness are not separate and independent tests.  Reasonableness is to be considered under the totality of the circumstances.  Citations having done so, the Court is of the opinion and finds that under the totality of the circumstances the annexation of the territory on which the City of Winona offered proof is reasonable with the exception of the Undeveloped Neal Parcel....

The chancellor followed his opinion with a final judgment ruling that the approval of the enlargement and extension of the boundaries of the City of Winona to be reasonable with the exception of the "Undeveloped Neal property."  The Neals filed their appeal objecting to the annexation of the "Winona Elevator Property." In their appeal the Neals raise the following issues for review by this Court:

3

**I.** **Whether the decision of the chancellor that granted annexation of the City of Winona of that property known as the Winona Elevator Company property, was manifestly erroneous or unsupported by substantial credible evidence?**

**II.** **Whether the Court should be left with a firm and definite conviction that a mistake was made by the trial court in ruling that the annexation of the Winona Elevator Company property by the City of Winona was reasonable?**

## DISCUSSION

¶4. This Court has very recently set out the standard of review in annexation matters in *In re Extension of Boundaries of City of Hattiesburg*, 840 So.2d 69 (Miss. 2003). Our Court has limited power in annexation matters, reversing a chancellor's findings as to reasonableness of the annexation only when a "chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence." *Id*. at 81 (citing *In re Enlargement and Extension of Mun. Boundaries of City of Madison v. City of Madison*, 650 So.2d 490, 494 (Miss. 1995)). *See also* *Bassett v. Town of Taylorsville*, 542 So.2d 918, 921 (Miss. 1989). In *Bassett,* we held that:

> Where there is conflicting, credible evidence, we defer to the findings below. Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence. We may only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made.

*Bassett*, 542 So.2d at 921 (citations omitted). "The judicial function is limited to the question of whether the annexation is reasonable." *In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So.2d 270, 276 (Miss. 1999). The party seeking the annexation has the burden of proving the reasonableness of the annexation. *Id*.

4

¶5.　　In the case of *In re Extension of the Boundaries of City of Ridgeland v. City of Ridgeland*, 651 So.2d 548, 550 (Miss.1995) this Court reiterated our long standing twelve indica of reasonableness in annexation cases:

> In a series of cases beginning with *Dodd v. City of Jackson*, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) down through most recently *McElhaney v. City of Horn Lake*, 501 So.2d 401, 403-04, (Miss.1987) and *City of Greenville v. Farmers, Inc.*, 513 So.2d 932, 941 (Miss.1987), we have recognized at least eight indicia of reasonableness. These include *(1)* the municipality's *need for expansion*, *(2)* whether the area sought to be annexed is reasonably within a *path of growth* of the city, *(3)* the potential *health hazards* from sewage and waste disposal in the annexed areas, *(4)* the municipality's *financial ability* to make the improvements and furnish municipal services promised, *(5)* the need for *zoning and overall planning* in the area, *(6)* the need for *municipal services* in the area sought to be annexed, *(7)* whether there are *natural barriers* between the city and the proposed annexation area, and *(8)* the *past performance* and time element involved in the city's provision of services to its present residents.
>
> Other judicially recognized indicia of reasonableness include *(9)* the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation; *Western Line [Consol. v. City of Greenville*, 465 So.2d 1057, 1059 (1985) ]; *(10)* the *impact* of the annexation upon the *voting strength of protected minority groups*, *Enlargement of Boundaries of Yazoo City [v. Yazoo City*, 452 So.2d 837 at 842-43 (1984) ]; *(11)* whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the *(economic and social) benefits* of proximity to the municipality *without paying their fair share of the taxes*, *Texas Gas Transmission Corp. v. City of Greenville*, 242 So.2d 686, 689 (Miss.1971); *Forbes v. Mayor & Board of Alderman of City of Meridian*, 86 Miss. 243, 38 So. 676 (1905); and *(12) any other factors* that may suggest reasonableness vel non. *Bassett v. Town of Taylorsville*, 542 So.2d 918, 921 (Miss.1989). *In the Matter of the Enlargement and Extension of the Municipal Boundaries of the City of Madison, Mississippi: The City of Jackson, Mississippi v. City of Madison*, 650 So.2d 490 (Miss.1995) (hereinafter, "*City of Jackson v. City of Madison*" ): *In the Matter of the Extension of the Boundaries of the City of Columbus, Mississippi: Kenneth R. Robinson, Walter J. Cunningham, Ralph Edward Hall, J.B. Wilkins, Arnette Neil Beard, and Ed Markham v. City of Columbus, Mississippi*, 644 So.2d 1168 (hereinafter, '*City of Columbus*" ); *City of Jackson*,

5

551 So.2d at 864; *See also*, **Bassett v. Town of Taylorsville**, 542 So.2d 918, 921-22 (Miss.1989).

*City of Ridgeland*, 651 So.2d at 550 (emphasis added). This Court has held that the twelve factors "are only indicia of reasonableness, not separate and distinct tests in and of themselves." *In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So.2d at 276. In addition, "[t]he chancellor must consider all [twelve] of these factors and determine whether under the totality of the circumstances the annexation is reasonable." *Id*.

## The (12) twelve indicia of reasonableness

### 1. Need to Expand.

¶6.     The Neals' main argument for this indicium of reasonableness is that the City has enough vacant land within its borders available for development. Further, the Neals argue in part that (1) the City has over 2,600 acres (34% of the land) and another 573 acres of flood plain available for development; (2) the City has a declining population with only a 37 person natural increase in the last ten years; (3) at the date of trial there were 10 residential and 7 commercial permits recorded for the past eleven years; (4) the annexation of 1990 along Highway 82 has not developed; (5) areas north of the Winona Elevator property and other areas of the City has no City water or sewer services indicating a "dismal record of past performance[2]; (6) there is no spillover growth according to their expert, and (7) the City is trying to have an old fashioned tax grab.

¶7.     The City argues that the unique location of the particular parcels of land rather than a lack of vacant land is the main reason to annex the land. The parcels are located at or near the intersection of a major transportation corridor and are and can be expected to grow in the future.

---

[2]  This contention is examined more fully in the Past Performance section later in this opinion.

6

¶8.     The dissent's main issue with the chancellor's finding of reasonableness for the annexation latches on to the Neals' arguments that this annexation is for sales taxes or a tax grab when there is allegedly no need to expand and no path of growth. These concerns will be addressed below in the opinion. In addition, the dissent makes a number of bullet points about the facts presented at the hearing.  We references all these points, save perhaps the last bullet concerning the 60 acres for industrial development.  This 60 acres of land was not further mentioned in the dissent and this issue concerns the first indica of reasonableness - the need to expand.  As will be discussed in more detail in the "need to expand" indicium, the fact that there may be some other vacant lands already available in the City does not prohibit annexation nor does it require that an indicia be found to be against the community proposing annexation. Most if not all of the dissent's arguments in opposition to the annexation are cited below under each applicable indicia of reasonableness.

¶9.     The trial court ruled:

> Winona based its assertion of need for expansion, not on lack of vacant land to accommodate future development, but rather on the unique locational characteristics of the particular parcels of property it seeks to annex.  Each parcel is located at or near the intersection of major transportation corridors,  it was undisputed that Parcels One, Two and Three are in the area Winona is most likely to develop in the near future. There was no objection to the annexation of any of these parcels. In fact a representative of the owners of Parcel Three testified to a desire to be annexed.

> The Objectors assert that Winona has no need to expand and thus the annexation is unreasonable.  It is true that growth had been slow compared to some areas of the state.  Perhaps the municipality may be wise to consider seeking judicial deletion of a number of less developed areas within the municipality.  However, annexation of each of the areas which are the subject of this action with one exception supports the reasonableness of the proposed annexation.

> The Winona Elevator Parcel is currently surrounded on three sides by the City of Winona.  The only way to access the property is by driving through the city limits of Winona.  Unlike the Undeveloped Neal Parcel he Winona Elevator Parcel is directly accessible by road from the existing City of Winona.

7

Because of the lack of direct road access and the topography of the Undeveloped Neal Parcel there appears little likelihood that development will occur there in the reasonably foreseeable future. On the other hand, growth into the Winona Elevator Parcel has already occurred. A view of this parcel, as well as the testimony and exhibits, reveals that it is already largely in urban usage. It was described by Michael Slaughter, the City's expert in the field of urban and regional planning, as a classic example of spillover growth. Winona is built out commercially up to the southern right of way of Highway 82. That development continues with little change in character on the north side of the highway and continues until the city limits pick up again north of the parcel.

This indicia favors the reasonableness of each parcel except the Undeveloped Neal Parcel.

¶10. This Court in the case of *In the Matter of the Enlargement and Extension of the Boundaries of the City of Macon v. City of Macon*, 854 So.2d 1029, 1034 (Miss. 2003), listed numerous factors to consider when determining whether a City has a reasonable need for expansion. When determining this indicia of reasonableness, the following factors may but do not have to include:

> (1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the city's need to exercise control over the proposed annexation area; and (12) increased new building permit activity. *In re Enlargement and Extension of Mun. Boundaries of City of Biloxi*, 744 So.2d at 279; *Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson*, 691 So.2d 978, 980 (Miss.1997); *Extension of Boundaries of City of Ridgeland v. City of Ridgeland*, 651 So.2d 548, 552 (Miss.1995); *Matter of Extension of Boundaries of City of Columbus*, 644 So.2d 1168, 1173 (Miss.1994).

*Id*. This Court has held that it has "declined to set an absolute amount of usable vacant land that would prevent annexation." *In the Matter of the Extension of the Boundaries of the City of Hattiesburg*, 840 So.2d at 85. Indeed annexation in various cities such as "Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively" were approved by this Court. *Id*. *See also Matter of City of Horn Lake*, 630 So.2d 10, 18 (Miss. 1993); *Enlargement*

*and Extension of Mun. Boundaries of City of Madison v. City of Madison*, 650 So.2d 490, 496 (Miss. 1995); *Extension of Boundaries of City of Ridgeland v. City of Ridgeland*, 651 So.2d at 554-56. The dissent questions the chancellor's findings because he did not hold that the City develop vacant land before annexing more land. However, as the above case law indicates, this Court refuses to set a limit on the vacant land available and has approved annexations when there has been as much as 59% usable vacant land available to an area. In addition, the evidence and testimony below revealed that the City met a number of the factors referenced in *City of Macon*, 854 So.2d at 1034, to meet the need to expand.

¶11.    The chancellor determined that the indicia of reasonableness for the need to expand hinged on the location of the proposed annexation area.[3] All the property was at or near a major transportation corridor. He also took into account the fact that the growth in that area was slow when compared to other parts of the State. In addition, he considered that the land was surrounded on three sides by the City, access to the Winona Elevator Property could only be achieved by driving through the City and the land was in urban usage and that area already was experiencing spillover growth. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶12.    The Mayor of Winona, Avis Vance Shivel (the Mayor), testified to a number of the indicia of reasonableness. The Mayor provided some general information about the property. The Neal Property is surrounded on three sides by the City. Highway 51 provides access to the property. Harry Neal owns

---

[3] The chancellor consistently found that the "Undeveloped Neal Property" did not meet the indicia of reasonableness for the twelve factors. Therefore, we will not discuss the exclusion of this piece of land in the discussion as it is assumed that annexation was not reasonable and this piece of land is not at issue on this appeal. Where appropriate, we will address the chancellor's ruling as the Parcels One, Two, and Three, especially where there is no distinction between these parcels and the Winona Elevator Property located in Parcel Four.

the grain elevator (a.k.a. the Winona Elevator Property), and Scott Neal owns the vacant undeveloped land (a.k.a. the "Undeveloped Neal Property").

¶13. The Mayor acknowledged that the slogan for the City is the "Crossroads of North Mississippi." This slogan refers to the transportation corridor (area to be annexed is in this corridor and the intersection of Highways 51 and 82). In fact, the city police wear a patch on their official uniform that has the "Crossroads of North Mississippi" motto. The population in the City is approximately 6,000 people while the County has approximately 14, 000. Since 1990, the Mayor testified that the City has not gained any new industry and that the City has over 2,600 acres of undeveloped land not in a flood plain available for development. The dissent points to the Mayor's testimony stating that the annexation is needed for sales tax purposes. This issue is discussed further in the opinion. However, the dissent neglects to cite the testimony of the Mayor in which she also stated that the annexation was for zoning purposes and to get the City in better shape.

¶14. The dissent cites in part to the testimony of Vice-mayor and alderman of ward 5, James E. Butts, Sr., (Butts) as to the purpose of the annexation. The dissent's excerpt of the testimony does not paint a complete picture of Butts' testimony. Butts stated that the City wanted to annex the proposed area to attract new businesses that were along Highways 82 and 51. That particular area is a high traffic area, and the aldermen wanted this area in the first phase of their plan. In addition, Butts described the area as a prime and central location. The area was not targeted just because the Neal property was located there but for all the area around the Highways 82 and 51 intersection. Butts also denied that the City wanted to annex the Neal property for tax purposes.

¶15. Michael Slaughter (Slaughter) was accepted as an expert for the City in the fields of civil engineering and city and regional urban planning. Slaughter reviewed many of the objectors' documents,

10

N-1through N-4, and stated that there was a slight decrease in the City's population from 1980 to 2000. Nevertheless, Slaughter stated that the City had a number of reasons for a need to expand which included, the Neal property is in the major crossroads of Highways 82 and 51; the Neal property is the only property within the quadrant that is not part of the City; both truck and automobile traffic, respectively, travel in and out of the Neal property either hauling grain or using the retail store; the activity in that quadrant needs proper planning and zoning control to protect the citizens of Winona; and the overall proposed annexation was small approximately 400 acres. From a planning perspective, Slaughter stated that it is not just a matter of "squaring up" the area, but rather the need for providing transportation planning (there are highways and a railroad in the area), providing services to the area and providing planning and zoning and whether all these things improve the overall municipal services. In addition, Slaughter stated that the area should have already been included in the City finding that it does not make good planning sense to not annex this area. Furthermore, Slaughter testified that it is not inconsistent to have a need for annexation and contraction (or deanexation) at the same time.

¶16. In addition, a portion of Highway 51 was increased from 2 lanes to 5 lanes which is indicative of the traffic and growth in the area. As for spillover growth, the City stated that the area along Highway 51 North as it approaches Highway 82 there is wall to wall in development. MDOT chooses the points to monitor for traffic count data, but when looking at the traffic count data for two places closest to the proposed annexation area the traffic increase over 69% and 81% for the areas of Highway 82 and west of Highway 51 and Highway 82 and west of Interstate 55 respectively.

¶17. We find that the chancellor's findings for this indicium was supported by substantial credible evidence and was reasonable.

## 2. Path of Growth.

11

¶18. The Neals argue that the City is not growing and is contracting and that there is no path of growth where there is no significant growth. In addition, the Neals argue that commercial growth has occurred on Highway 51 south of Highway 82 or along Highway 82 toward the west and Interstate 55; there are not many businesses in the area located near the Neal property that have not been there at least 10 years; there were low numbers of building permits issued from 1990 to 2000; the Winona Elevator Property is accessed by federal Highway 51 and Highway 82; the property on receives fire protection from the City; the property has no community of interest with the City as it serves farmers, and the Mayor indicated that the annexation was for tax purposes.

¶19. The chancellor stated:

> With regard to the question of whether the property sought to be annexed lies in a path of growth of the City of Winona, the Court finds that each parcel is clearly immediately adjacent to the existing city. With the exception of the Undeveloped Neal Parcel each is presently accessible by in use public streets, highways and roads. Spillover growth has occurred only in the Winona Elevator Parcel. The other parcels are vacant, but with the exception of the Undeveloped Neal Parcel each appears to be prime for commercial development. Concerning each of these factors each parcel appears to lie in the path of growth of the City of Winona. See *In re Enlargement of Municipal Boundaries of the City of Biloxi*, 744 So.2d 270, (Miss. 1999) *Extension of Boundaries of the City of Ridgeland*, 651 So.2d 548 (Miss. 1995). With the exception of the Undeveloped Neal Parcel, all lie in the path of growth of the City. The Undeveloped Neal Parcel is presently unserved by direct road access. Under present conditions this factor does not weigh in favor of annexation of that parcel as it does with the others.

¶20. When considering the indicia of reasonableness for the path of growth, a city need only show that the areas desired to be annexed are in "a" path of growth this does not mean that the area is "the most urgent or even the city's primary path of growth." *In the Matter of the Extension of the Boundaries of the City of Hattiesburg*, 840 So.2d at 86-87 (quoting *City of Jackson*, 551 So.2d at 865). *See In re Confirmation of Alteration of the Boundaries of the City of Horn Lake*, 630 So.2d 10, 18 (Miss. 1993).

¶21.    This Court has held:

>   The test for evaluating the reasonableness of a chosen path of growth is "whether an area
>   is in a path of growth, not necessarily a City's primary path of growth." *In re City of
>   Horn Lake*, 630 So.2d 10, 19 (Miss.1993). This Court has further stated that "our law
>   gives municipalities the discretion, based on convenience and necessity, to choose between
>   various paths of growth by annexation."*Ritchie v. City of Brookhaven*, 217 Miss. 860,
>   65 So.2d 436, 439 (1953). The law is clear that the annexation area must be in "a" path
>   of growth not "the" path or "only" path of growth.

*City of Macon*, 854 So.2d at 1029.

¶22.    This Court has further set out a number of factors to consider whether the path of growth is

reasonable. These may or may not include:

>   (1) spillover development in annexation area; (2) annexation area immediately adjacent to
>   City; (3) limited area available for expansion; (4) interconnection by transportation
>   corridors; (5) increased urban development in annexation area; (6) geography; and (7)
>   subdivision development. *In re Extension and Enlargement of the Mun.
>   Boundaries of the City of Biloxi*, 744 So.2d at 280;*Enlargement and Extension
>   of Mun. Boundaries of City of Madison v. City of Madison*, 650 So.2d 490, 497
>   (Miss.1995); *Extension of Boundaries of City of Ridgeland*, 651 So.2d at 556.
>   This Court in *Enlargement and Extension of Mun. Boundaries of City of
>   Meridian v. City of Meridian*, 662 So.2d 597, 612-13 (Miss.1995), held that the
>   most important factors when determining the reasonableness of path of growth are the
>   adjacency of the proposed annexation area to the City, accessibility of the proposed
>   annexation area by City streets, and spillover of urban development into the proposed
>   annexation area.

*City of Macon*, 854 So.2d at 1037.

¶23.    The chancellor found that spillover growth occurred in the "Winona Elevator Property", each parcel

of land was immediately adjacent to the City, each piece of property is "prime for commercial

development", and that each parcel of land is in the path of growth of the City. The testimony and evidence

at the hearing supports the chancellor's finding of reasonableness for this indicia and it was supported by

substantial credible evidence.

¶24. The "Winona Elevator Property" is clearly adjacent to the City and is in fact surrounded by the City on three sides. While the roads leading to the "Winona Elevator Property" are Highways 51 and 82, a traveler drives through the City to get there. In addition, the motto of the City is the "Crossroads of North Mississippi" and numerous witnesses testified that this area is a major transportation corridor.

¶25. In addition, even though the City's population showed a slight decreased by 300 people from 1990 to 2000, Slaughter stated that this does not indicate that the City has no path of growth. Slaughter maintains that it is more important to look at the commercial activities rather than population growth in the limited proposed annexation area. A portion of Highway 51 was expanded in 1996-1997 from a two-lane road to a five-lane road which is indicative of the traffic and growth. Slaughter stated that the transportation corridor is a major factor in attracting development. In addition, Slaughter reviewed the traffic counts from 1990 to 1999 at two points closest to the proposed annexation area and found that between Highway 82 and west of Highway 51 the traffic increased by over 69% and between Highway 82 and west of Interstate 55 the traffic increased over 81%. Although contested by the Neals' expert, the City expert stated that the City did have spillover in that area.

¶26. Again, the above testimony concerning the factors to consider whether the path of growth is reasonable and testimony from City officials and employees is in conflict with the dissent's no path of growth argument and claim that the annexation was only for sales tax purposes. While it is true that the Mayor did testify that the annexation may be for "sales tax" purposes, she also stated that the annexation was for zoning purposes and to get the City in better shape. Other witnesses such as alderman Butts denied that the annexation was for tax purposes. He stated that the area was not needed to pay the bills, rather the annexation was to attract more industry to the area, the area was close to the City and had high amounts of traffic, and it was a prime and central location. The City clerk, Benita Smith, also stated that

14

the City was paying for itself, the City was operating within its budget and did not need the proposed annexation area to make ends meet, the City had only one outstanding debt of approximately $200,000, and the City had not been operating at a deficit nor has it needed to dip into any existing funds to operate for the past two years.

¶27. We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

### 3. Health Hazards.

¶28. The Neals argue that the "Winona Elevator Property" has no significant health hazards in existence and this indica of reasonableness is of little importance in this case. In support of their argument, the Neals rely upon the fact that the property already has a sewage treatment system. Harry Neal stated that he requested the City's sewer system service in 1985, but the City denied his request. Therefore, he installed his own system, the system has an alarm system and is serviced for repairs as needed by Michael Patridge. The new Department of Environmental Quality (DEQ) regulations now require the waste to be treated on-site instead of having it go into a drainage ditch, however, Harry Neal stated that he would modify his system to meet the new requirements.

¶29. The chancellor stated:

> The soils in the area sought to be annexed are not conducive to the use of septic tanks according to the soil surveys prepared by the United States Soil Conservation Service. As each of the parcels are vacant except the Winona Elevator Parcel, one would not expect to find existing health hazards from the disposal of sewage. On the Winona Elevator Parcel however, the undisputed evidence is that the sewerage is being disposed of in a manner inconsistent with the present environmental laws of the state. On the date of the Court ordered inspection of the premises Michael Slaughter, a civil engineer, found that effluent was not being chlorinated. This indicator favors annexation.

15

¶30. This Court has further set out a number of factors to consider whether the potential health hazards are reasonable. These may or may not include:

> (1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage. *In re Extension and Enlargement of the Mun. Boundaries of the City of Biloxi*, 744 So.2d at 280; *In re Extension of Corporate Boundaries of the Town of Mantachie*, 685 So.2d 724, 727 (Miss.1996); *Extension of the Boundaries of City of Ridgeland*, 651 So.2d at 558; *City of Horn Lake*, 630 So.2d at 18; *In re Matter of the Extension of the Boundaries of the City of Jackson*, 551 So.2d at 866; *City of Greenville*, 513 So.2d at 935.

*City of Macon*, 854 So.2d at 1038.

¶31. The chancellor found that the sewage disposal on the "Winona Elevator Property" was not in accordance with state environmental laws. A court-ordered inspection further revealed that the effluent was not chlorinated. In addition, evidence showed that the soil in the area to be annexed was not conducive to septic tank usage. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶32. Specifically, on the "Winona Elevator Property", Slaughter conducted an inspection of the premises as part of the discovery process in September prior to the hearing. After inspecting the sewer treatment system on the property, Slaughter concluded that it posed a health hazard and in general there were existing and potential health hazards on the site. He based his opinion on the fact that chlorine tablets were not touching the effluent at all and the system was not properly working so there was a lack of treatment and the effluent was leaving the property. During the hearing on February 12, 2002, Slaughter visited the site with the chancellor and attorneys and he found no change in the chlorination system. He found that the aeration system was makeshift and still in place and that the system did not meet environmental regulations.

¶33.    Furthermore, the "Winona Elevator Property" has some 55 gallon drums with chemicals or oil in them for disposal. During his previous inspection, he found standing water and some tires with water in them on the property that indicated that either the tires need to be picked up or have mosquito control. Furthermore, after reviewing and mapping data from the Montgomery County United States Department of Agriculture Soil Survey concerning septic tank soil suitability, Slaughter stated that survey indicates that the area of the Neal property that fronts Highway 51 is considered to be severely unsuitable. This means that the soil would not absorb effluent from a filed line and a septic tank; and therefore, this limits the type of treatment facility that would be available for the site.

¶34.    The dissent argues that this factor should not weigh in favor of the City. However, there is ample testimony to show that the water system was not working properly; the Neals knew beforehand that there was to be an inspection of the property, yet the system was not in proper working order nor was it in working order when the chancellor and attorneys viewed the site during the hearing; the ground was not conducive to septic tank usage; and there were 55 gallon drums, tires, and standing water on the property.

¶35.    We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

### 4. Financial ability to provide municipal services.

¶36.    The Neals argue that, while the City has the bonding capacity and probably has the cash on hand to fund the improvements, the City's financial outlook is not good. The Neals base this conclusion on deficits in the general fund for five years, a decrease in the City's assessed value, decrease in the City's reserve fund balance and a population decline. Further, the Neals cite to their city planner's assessment that the City is in a financial condition that must wait on development and that the City would not have the

financial ability if the City had to provide water and sewer to all its citizens, which it is not currently doing at this time.

¶37.    The chancellor stated:

> The evidence presented clearly revealed that the City of Winona has the ***financial ability*** to provide the services and make the improvements set out in its ordinance of annexation. Winona has reserves in both its general fund and enterprise funds sufficient to meet the obligations of this proposed annexation. Coupled with the small size of the proposed annexation and the fact that Winona presently provides services either to the annexation area (fire protection) or to adjacent lands (police protection) even the objectors do not seriously contend that Winona lacks the financial ability to serve the are it seeks to annex.    See: ***In re Extention of Corporate boundaries of the Town of Mantachie***, 685 So.2d 724, 728 (Miss. 1996) ***Matter of Extension of Boundaries of City of Columbus***, 644 So.2d 1168, 1171 (Miss. 1994) ***City of Greenville v. Farmers, Inc***. 513 So.2d 932, 935 (Miss. 1987) ***Matter of Extension of Boundaries of City of Ridgeland***, 388 So.2d 152, 156 (Miss. 1980) ***Extension of Boundaries of City of Biloxi v. City of Biloxi***, 361 So.2d 1372, 1374 (Miss. 1978) ***In re City of Gulfport***, 179 So.2d 3, 6, 253 Miss. 738, (Miss. 1965).

The dissent notes that the City has had deficits for the past five years. However, as the Neals note in their brief and the chancellor also noted in his finding, this issue is not seriously contested. The Neals admit that the City probably has the bonding capacity and ability to fund the improvements. In addition, the testimony below shows that the City met many of the factors to consider whether an area has the financial ability for the annexation.

¶38.    The factors to consider on whether there is reasonable financial ability for the annexation which may or may not include:

> (1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area. ***Town of Mantachie***, 685 So.2d at 728; ***City of Meridian***, 662 So.2d at 611; *Extension of Boundaries of City of Ridgeland*, 651 So.2d at 558; ***City of Columbus***, 644 So.2d at 1171; ***City of Greenville v. Farmers, Inc***., 513 So.2d at 935; ***In re Extension of Boundaries of City of Ridgeland***, 388 So.2d 152, 156

(Miss.1980); *In re Extension and Enlargement of the Mun. Boundaries of the City of Biloxi*, 361 So.2d at 1374; *Bridges v. City of Biloxi*, 253 Miss. 812, 178 So.2d 683, 685 (1965); *In re City of Gulfport*, 253 Miss. 738, 179 So.2d 3, 6 (1965).

*City of Macon*, 854 So.2d at 1039-40.

¶39. The chancellor found that the City had the financial ability to provides the services and make improvements set out in the annexation ordinance. He based this conclusion on the fact that the City had reserves in the general and enterprise funds to meet the obligations to the proposed annexation area. In addition, he noted that the annexation area is small and the City either already provides services to these areas, such as fire protection, or that the City already provides services to adjacent areas of the proposed annexation area such as, police protection. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶40. The Mayor testified that the City has the financial ability to make improvements such as sanitary sewers and water, and that these improvements are in the budget. She further stated that services in the ordinance of annexation are also in the services and facilities plan. This is part of the City's five-year plan, and the Mayor believes that the City can meet these obligations. In addition, Benita Smith (Smith), the city clerk, testified regarding the City's financial status. The proposed water expansion to the annexed property is about $50,000, and the proposed sewer costs are about $29,000. Smith stated that there is not a problem with funding the roughly $80,000 in expenditures for water and sewer lines. The City had $700,000 in reserve from the water and sewer enterprise fund for the improvements. This money comes from a user fee associated with the services and not from ad valorem taxes. The City's assessed values were over $16 million in 1999; $17 million in 2000, and $20 million in 2001. Theses figures were based on valuation differences and not additional taxable property. In addition, Smith stated that the City is

19

currently working within its budget and does not need the proposed annexation areas in terms of maintaining financial stability. In fact, the City had only one outstanding equipment debt of $200,000 at the time of the hearing in addition to some money borrowed, not from a bond, for the police department building. Smith believed the City's bonding capacity to be approximately $2.5 million. Smith testified that the City can meet its financial obligations, has not been operating on a deficit, and pays for itself.

¶41. As for the fire protection, the department already provides fire services to this area. The County has an agreement with the City to protect the area in the proposed annexation area. Adding the "Winona Elevator Property" and the other land to the City limits will give this land priority fire protection over the County lands. The Chief of Police of the City, Johnny Hargrove, stated the police already patrol near the property and if the Neal property became part of the City then the police department would not need any more employees or equipment to patrol this area.

¶42. We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

### 5. Zoning and planning.

¶43. The Neals contend that the City is not really involved in planning citing to a number of deficiencies in the planning and zoning ordinances. In specific, the Neals note that the comprehensive plan is 34 years old, the zoning map is not updated and does not include some areas annexed in 1970 and 1997, there is no capital improvement plan, and that the city maps are incomplete and do not show all the City's water and sewer systems. Furthermore, the Neals argue that the "Winona Elevator Property" is next to the City's property which is zoned C-3 for residential and commercial usage, therefore, the Neal property is and can develop in the future to be consistent with the present City zoning.

¶44. The chancellor stated:

20

Though the evidence reflected some deficiencies in Winona's administration of its planning and zoning efforts in the past, the testimony reveals that the City has taken steps to rectify the situation. The City has retained the services of urban planners to assist with updating its ordinances and plans. Winona does have in place adopted subdivision regulations and standard building codes. On the other hand, unincorporated Montgomery County has no land use or building codes whatsoever. Given the proximity of the parcels proposed to be annexed to the existing City and the total absence of land use controls in the County, this factor favors annexation.

¶45. This Court has upheld an annexation even when a town had no zoning ordinance and presented no evidence of any urban planning. *In re Enlargement and Extension of Corporate Boundaries of the Town of Mantachie*, 685 So.2d 724, 728 (Miss. 1996). On the other hand, this Court has upheld an annexation even though a county already had a zoning ordinance. *City of Ridgeland*, 651 So.2d at 559. The dissent argues that the Neals' property is already zoned in conformity with surrounding land. However, just because a county may have zoning ordinance does not mean that an area cannot be annexed. *See City of Ridgeland*, 651 So.2d at 599.

¶46. The chancellor acknowledged the City's deficiencies in planning and zoning. However, he also based his decision on the fact that the City was in the process of rectifying any problems and had hired urban planners to assist the City. In addition, the chancellor considered that the City already had subdivision regulations, building codes whereas the County had no land or building codes. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶47. The City readily acknowledged the deficiencies in its planning and zoning in the proposed annexation area as evidenced by many of its witnesses in its case in chief. However, the testimony also indicated that the City was making strides in correcting this indicia of reasonableness. The Mayor stated that the City has a new zoning board and control board. In addition a firm, Bridge & Slaughter, had been retained and is working with the City to update planning documents, zoning ordinances, and maps. The

21

City has prepared cost estimates for the extension of utilities to the Neal Property, including water and sewer. This extension plan has been adopted by the Board of Aldermen. Phase I of the plan is adopted with a 5 year plan to extend sanitary sewers and water. The Mayor acknowledged that the a 1994 map is the most up to date.

¶48. Booker Clay, the City inspector and fire chief, has condemned twenty buildings in the past few years. In addition, he stated that the City and Board of Aldermen are serious about this issue. Butts stated that Bridge & Slaughter were hired to assist the City with updating planning documents, such as the comprehensive plan and zoning ordinances and possibly deannexing some areas.

¶49. Slaughter acknowledged that there were deficiencies in the planning and zoning process, however, he was working on updating the comprehensive plan, zoning ordinances and subdivision regulations for the City. He recommended that the City have a new comprehensive plan since the current plan is from 1967. In addition, the zoning ordinances and the subdivision regulations were last updated in 1967 and 1966 respectively. Even with the dated planning and zoning, Slaughter stated that the City is still in a better position with its commitment to update than the County of Montgomery which has no comprehensive plan, no zoning, no subdivision regulations, no planning and zoning boards and no building or housing codes.

¶50. Slaughter admitted that the City had no capital improvement plan, which is part of the comprehensive plan, but that he was working on including this plan. He gave an estimate of the time frame in which the plans would be completed at the hearing as 12-18 months for the comprehensive plan, capital improvement plan and subdivision regulations and the zoning plan would be updated after the comprehensive plan is completed and adopted. Slaughter determined that the annexation is not unreasonable simply because there is not a completed comprehensive plan and the City has zoning and subdivision plans that can be applied.

¶51.    We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

## 6. Municipal services.

¶52.    The Neals argue that the services already provided to the property and its owners are sufficient for their needs. They cite to the fact that they have an on-site sewage treatment facility, potable water from a local water association, fire protection by a city and county agreement, law enforcement by the sheriff's office, garbage service with the county and roadways maintained by the state and federal government into the area. In addition, the Neals cite to numerous instances in which they believe the City may have services but are not adequately providing the services within the existing City limits. The Neals maintain that the City has difficulty and lacks certain services such as animal control, some unpaved City streets, lack of water and sewer services to all areas of the City, deficiencies in the zoning maps, dilapidated houses, abandoned cars, illegal dumping, and gang problems.

¶53.    The chancellor stated:

> As with all vacant land annexed, there is presently little need for municipal services on the undeveloped parcels. On the uncontested parcels it appears, however, that reasonably anticipated development will lead to a need for services as development occurs. Because development presently appears unlikely to the Undeveloped Neal Parcel, the Court finds that there is no reasonably anticipated need for services there. The Winona Elevator Parcel on the other hand is essentially developed. It already benefits from the provisions of municipal fire protection through an interlocal agreement between Winona and Montgomery County. Ongoing businesses are operated at the site which will benefit from the services of the City of Winona. This factor favors the annexation of all but the Undeveloped Neal Property.

¶54.    Factors to consider on whether the need for municipal services is reasonable, may or may not include:

> (1) requests for water and sewage services; (2) plan of the City to provide first response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide

23

police protection; (5) plan of City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density. ***Enlargement and Extension of the Mun. Boundaries of City of Madison***, 650 So.2d 490, 502 (Miss.1995); ***Extension of Boundaries of City of Ridgeland, 651 So.2d at 559; City of Horn Lake***, 630 So.2d 10, 21 (Miss.1993).

***City of Macon***, 854 So.2d at 1041-42. In sparsely populated areas, this Court has found that "there is less of a need for immediate municipal services" than densely populated areas. ***Id***. (citing ***In re Matter of the Extension of the Boundaries of the City of Jackson***, 551 So.2d at 867).

¶55. The chancellor determined that the indicium of reasonableness for municipal services favored annexation. He based his conclusion on the fact that the undeveloped land, that is uncontested parcels of land, will need municipal services as the land develops. In addition, he acknowledges that the "Winona Elevator Property" already benefits from City fire protection and that the ongoing business will benefit from City services. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶56. The Mayor stated that no additional personnel will be needed to provide additional services to the proposed annexation area. She stated that MDOT maintains Highway 51 that is in front of the "Winona Elevator Property." The highway patrol patrols the highway. In addition, fire protection was provided to the County of Montgomery through a contract with the City. The County pays the City a sum of money each year to provide fire protection. The Mayor did say that the "Winona Elevator Property" did not need municipal services during cross examination. However, she later stated on re-direct that the Neal property did not have adequate water in the event of a fire. The City proposes placing a fire hydrant near the property. She indicated that the only reason the property has fire protection now is because the property is in such close proximity to the City. Further, the Mayor stated that the city police currently drive by the proposed annexation area (PPA) on Highway 51. This highway is in the City and if the annexation is

24

granted then the police can enforce the law on this area. In addition, the City has more police personnel and, therefore, it can patrol smaller areas in the City than the county sheriff's department. The City also collects trash two times a week as opposed to one time in the County.

¶57. Smith, the city clerk, stated that the City can meet the financial obligation of the outlay of approximately $80,000 for the combined water and sewer services to the proposed annexation areas. Further, she stated that the City pays for itself and does not need the proposed areas for revenue.

¶58. In addition, Patricia Curington (Curington), the water and sewer superintendent for the City, stated that the estimate of $80,000 for the water and sewer services to the proposed annexation area, which included "Winona Elevator Property", is a reasonable price. When questioned about the overflows, in the sewer system, Curington stated that every sewer system overflows and Winona's problems are no different than other places.

¶59. As for police protection, the City's Chief of Police, Johnny Hargrove, stated that the City can provide a higher level of protection to the Neal property that the Montgomery County Sheriff's Department. The City has more employed officers than the sheriff's department, a better response time, the City's officers are all certified and generally have attended more training schools than the staff at the sheriff's department. If the Neal property became part of the City then the police department would not need any more employees or equipment to patrol this area.

¶60. Booker Clay (Clay), the City's fire chief and building inspector, stated that the County of Montgomery does not have fire protection nor maintain a fire truck or fire station in the proposed annexation area. Instead, the City and County have an agreement in which the City provides fire protection to the area. While the City provides fire protection for parts of the County, the City has priority over the

County for fire protection. The City has three fire trucks, eight full time employees and ten volunteer employees. The fire rating for the City is also higher than that of the County.

¶61.    Slaughter also stated that there will be no additional personnel needed to provide for extending fire and police protection and parks and recreation to the proposed annexation area. Furthermore, the "Winona Elevator Property" had some 55 gallon drums with chemicals or oil in them for disposal. During his previous inspection, he found some tires with water in them on the property that indicated that either the tires need to be picked up or have mosquito control. In addition to the testimony Exhibit P-8 also provided a list of City versus County services. The City provides for other services such as more frequent garbage pick-up, parks, pest control and parks and recreation facilities. As previously listed in the chancellor's opinion concerning the potential health hazards, a soil survey revealed that the soil in the annexation area was unsuitable for septic tanks.

¶62.    The dissent claims that the services are adequate, and therefore, the chancellor erred in finding annexation favored this factor. As the testimony showed, the Neals had some of these services, however, the Mayor stated that the Neals did not have adequate water services in the event of a fire and a new hydrant would be placed near the site, the City had a first response or preference to fires before the county. In addition, the services would increase for the Neals.

¶63.    We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

## 7. Natural barriers.

¶64.    The chancellor ruled:

There are no natural barriers between the City of Winona and the areas it seeks to annex. This was undisputed at trial. This factor does not mitigate against the reasonableness of the proposed annexation.

26

The Neals made no argument in their brief on this issue, presumably because this indicia was undisputed before the court. Accordingly, this Court need not address this issue on appeal.

The dissent argues that the factor should be neutral, however, there were no natural boundaries and no dispute as to this factor. Facts that are undisputed still have a bearing on a reasonableness factor and should not necessarily be considered neutral. Furthermore, as stated above the Neals did not argue this factor and as such this Court need not address this factor on appeal.

### 8. Past performance.

¶65. The Neals argue that the City's past performance record is abysmal. They rely in part upon the fact that certain parts of the City do not have city water sewer or fire hydrant services even though annexation to this area occurred in 1970. Indeed, the Neals acknowledge that the 1970 annexation stated that the City would not provide improvements "at the present time."[4] The 1990 annexation specifically stated what improvements or services the City would and would not provide to the annexed area.[5] In

---

[4] The 1970 annexation read in part as follows:

Section 3: That the City of Winona, Montgomery County, Mississippi, shall make the following improvements in said annexed territory, to-wit:

> No improvements will be made by the City of Winona in the territory proposed to be annexed at the present time.

> The City of Winona, Mississippi, shall furnish in said annexed territory the following municipal or public services beginning on the effective date of this Ordinances, to-wit:

>> Police protection, fire department facilities (except fire hydrant services where not now available), maintenance of existing streets and public school facilities.

[5] The 1990 annexation read in part as follows:

Section 3: That the City of Winona, Montgomery County, Mississippi,

27

general, the Neals also point out that not all of the areas annexed over 31 years ago have city water, sewer and fire hydrants. Johnstone, the Neals' expert, stated that in her opinion, the past performance of the City does not indicate much certainty that the City would provide services to the residents or businesses of the proposed annexation area.

¶66. The chancellor stated:

shall make the following improvements in said annexed territory, to-wit:

(a) Area One (Area of Campbell Hill):

City will provide sewer lines ans pumping station based upon special assessment demand by residents on a 50/50 percent share basis. City will pave streets based upon special assessment demand by the residents on a 1/3, 1/3, 1/3, share basis, approximately 0.3 miles. No additional water services are planned or needed since are is 100% served and has adequate fire protection.

\*      \*      \*      \*      \*

(d) Area Four (Area of Bypass, Elevator and Water Tank):

City will provide six (6) inch mains and fire hydrants to are within two years to existing development and will provide similar services to the By-Pass intersection when requested for new development. City will provide sewer mains to the By-Pass intersection when requested by new development. Sewer services to Devine Street residents will be provided based upon 50/50 percent special assessment upon demand of residents. Streets will be improved and paved based upon special assessment method of 1/3, 1/3, 1/3 share basis upon demand of residents.

\*      \*      \*      \*

SECTION 4: That the City of Winona, Montgomery County, Mississippi, shall furnish in said annexed territory the following municipal or public services beginning on the effective date of the Ordinance, to-wit:

AREA ONE: Police and fire protection, garbage, planning and zoning services and maintenance of existing streets. City shall furnish public school facilities, subject to any conditions or limitations imposed by the terms, provisions and judicial or administrative decisions pertaining to Miss. Code, Ann., Section 37-7-611; Section 47 of the Mississippi Uniform School of Law of 1986; and Miss. Code, Ann., Section 37-7-103, As Amended.

Section 4 pertaining to Area Four has the exact language as Section 4 Area One.

28

Though the evidence reveals that Winona has not extended all municipal services to all areas of the existing City, the ordinances under which the prior annexations took place made no such promises. In addition the evidence reveals that most of the services proposed are either in place or can be accomplished with a relatively modest expenditure. The Court cannot say that the proposed annexation is unreasonable based on the past performance of the City. Given the scope of this matter, this factor is, at best neutral.

¶67. This Court upheld an annexation in *City of Hattiesburg*, 840 So.2d 69 (¶¶ 67, 70), albeit the Court found this indicium most egregious, where the City had failed to provide municipal services for some areas of the City for more than 18 years. In this instance, however, the chancellor considered that the City's prior annexation promises did not provide for full services to all areas of the annexed area.

¶68. The chancellor determined that the indicium of reasonableness for past performance was neutral at best. The dissent argues that this factor does not favor annexation based upon the opinion of the Neals' expert, which is disputed by the City's expert, and past performance of extending services to other areas of the City. The chancellor based his conclusion on the fact that the City had not extended services to all parts of the City, but the past annexations made no promises to this extent either. As for this proposed annexation, the chancellor found that most of the services are in place or can be accomplished at a low cost. Substantial credible evidence at the hearing supports the chancellor's finding of neutrality.

¶69. The City argues that the items that the Neals are complaining about were excluded from the promises of the City and not included in prior annexations. Slaughter reviewed past annexations from 1970 and 1990. These annexations were not what he descried as "typical." Indeed, the Neals even state that the 1990 annexation was a "highly unusual document."

¶70. When reviewing what was promised by the City and what was furnished, Slaughter believed that the City had good past performance. Slaughter testified that the City's past performance was good even though the City has not provided water and sewer to all areas of the City. He stated that it is not unusual

29

for a City to be served by more than one water system as this occurs throughout the State. The chancellor reviewed all the information presented at the hearing including those facts that the Neals and the dissent believes weighs against the finding that this factor is neutral. However, the chancellor and the Neals acknowledge that past annexations were unusual, and the chancellor determined that under those prior annexations the City never made certain promises. The experts differed in their opinions on the matter, but the chancellor was present and heard all the evidence, including conflicting testimony, on this issue.

¶71. We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

### 9. Economic or other impact on residents and property owners.

¶72. The Neals argue that they will not receive any services from the City that they do not already have available to them. In addition, the Neals claim that they will be forced to pay higher ad valorem taxes and have the expense of connecting to the sewer system while having to get rid of the existing wastewater treatment system. The Neals describe the annexation as nothing more than a "tax grab that is accompanied by no services not already enjoyed by the Objectors."

¶73. The chancellor stated:

> The Court has reviewed the evidence with regard to the impact on the property owners. [FN 3 following this sentence states that "There are no residents.] With the exception of the Undeveloped Neal Parcel, the property owners will receive value upon annexation. This is particularly true of the Winona Elevator Parcel. Upon annexation the City proposes a substantial expenditure to provide municipal utility services to this property. These improvements will include upgrading the water supply to afford municipal level fire protection. Additionally, the Winona Elevator Parcel will receive all other municipal services. The City of Winona has demonstrated through plans and testimony, that all areas, except the Undeveloped Neal Parcel, will receive something of value in return for the taxes to be collected. See: ***Matter of the Extension of Boundaries of City of Columbus***, 644 So.2d 1168, 1172 (Miss. 1994).

¶74.    "[T]he mere fact that residents in the PAA will have to pay more taxes is insufficient to defeat annexation." *City of Hattiesburg*, 840 So.2d at 93 (quoting *In re Enlargement and Extension of Municipal Boundaries of the City of Biloxi*, 744 So.2d 270, 284 (Miss.1999)); *In the Matter of the Confirmation of Alteration of the Boundaries of the City of Horn Lake,* 630 So.2d 10, 23-24 (Miss. 1993).  This Court has held:

> [T]he Court is required to balance the equities by comparing the City's need to expand and any benefits accruing to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area. The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness. *Jackson*, 551 So.2d at 867-8.

*Matter of the Extension of Boundaries of City of Columbus*, 644 So.2d 1168, 1172 (Miss. 1994); see also *In the Matter of the Confirmation of Alteration of the Boundaries of the City of Horn Lake,* 630 So.2d 10, 23-24 (Miss. 1993) (quoting *Matter of Boundaries of City of Jackson*, 551 So.2d at 867-868).  In *Columbus* this Court further held that "as equity and reasonableness are equivalent, the fairness of a given annexation is the ultimate question that we seek to answer." 644 So.2d at 1172 (citing *Western Line Consol. School Dist. v. City of Greenville*, 465 So.2d 1057 (Miss. 1985)).

¶75.    The chancellor determined that there are no residents in the proposed annexation area, but that the property owners of the land will receive something of value for the tax dollars collected by the City.  He based his conclusion on the fact that on the "Winona Elevator Property" in particular, the City will make substantial expenditures to extend municipal services to the property, including up grading the water for municipal fire protection. In addition, plans and testimony provides by the City demonstrated that all areas

31

will receive benefits for collected tax dollars. Substantial credible evidence at the hearing supports the chancellor's finding of reasonableness for this indicium.

¶76. Slaughter stated that the Neals will receive good value for their taxes. Testimony indicated that the "Winona Elevator Property" will be assessed approximately $1,406.69 in taxes or $255.76 per acre. If the business files a long tax form then these taxes are deductible. In addition, the chancellor noted that the "Winona Elevator Property" will receive all municipal services. These services were previously discussed in section six concerning municipal services above and include services such as water, sewer, fire, police, parks and recreation, trash and pest control.

¶77. The dissent argues that the chancellor evaluated this factor just like factor six concerning municipal services, that is by evaluating only municipal services, and that the Neal property has adequate services. It is true that this factor and factor six both address municipal services. It is also true that this is the same argument as asserted by the Neals in their brief. However, this factor also addresses how the City will provide a property owner benefits in exchange for tax dollars paid to the City. Both this factor and factor six address municipal services, but these are measures by which a chancellor can compare the tax dollars spent in relation to benefits received by a property owner, therefore an overlap may occur when determining various factors. Further, testimony revealed that the Neals may be able to deduct the taxes to the property, the Neals at the very least had to upgrade their on site treatment system and the City services provide more to the property than the County services. This above testimony and evidence is merely to give a better perspective of the situation and point out that the Neals, even if the chancellor had not ruled that their property be annexed, still had other increased expenses.

¶78. We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

## 10. Impact on minority voting.

¶79.    The Neals argue that pursuant to *City of Pleasant Grove v. United States*, 479 U.S. 462, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987), even annexing vacant land can impact voting strength when a city has selectively annexed in the past to protect white voting majority or avoid annexing African-American communities.  Furthermore, the Neals maintain that the 1970 annexation and the re-drawing of the Winona Separate School District took place for racial reasons and that the City maintained a white majority population until 2000. In addition, the Neals argue that a residential area just outside the City and populated by a predominately African-American community is not included in any future annexation plans.  All of these factors indicate, according to the Neals, the City's attempt to exclude African-Americans.

¶80.    The chancellor stated:

> The area sought to be annexed is presently vacant or in commercial or industrial use.  It is anticipated that the property will be developed commercially or industrially.  The only portion of the proposed annexation area where residential development was mentioned as a possibility was on the Undeveloped Neal Parcel.  Based upon the fact that there are no residents in the area and none are reasonably anticipated, the annexation will not have an impact, positive or negative, on the voting strength of a protected community.

In *City of Pleasant Grove*, the United States Supreme Court held:

> An annexation of inhabited land constitutes a change in voting practice or procedure subject to preclearance under § 5. *City of Richmond v. United States*, 422 U.S. 358, 368, 95 S.Ct. 2296, 2302, 45 L.Ed.2d 245 (1975); *Perkins v. Matthews*, 400 U.S. 379, 388, 91 S.Ct. 431, 436, 27 L.Ed.2d 476 (1971)). Even the annexation of vacant land on which residential development is anticipated must be precleared before those moving into the area may vote in the annexing jurisdiction. In *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), this Court affirmed the denial of preclearance to 13 annexations, 9 of which were vacant land. *See id*., at 194, 196, 100 S.Ct., at 1570, 1571 (POWELL, J., dissenting); *City of Rome, Ga. v. United States*, 472 F.Supp. 221, 246 (DC 1979). This holding is consistent with the well-established teaching of *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), that Congress intended the preclearance provisions of the Voting Rights Act to be given "the broadest possible scope," *id*., at 567, 89 S.Ct., at 832, and to reach "any state enactment which alter[s] the election law of a

covered State in even a minor way," *id*., at 566, 89 S.Ct., at 832. Allowing a State to circumvent the preclearance requirement for annexations by annexing vacant land intended for white developments would disserve Congress' intent to reach "the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Id*., at 565, 89 S.Ct., at 831. Moreover, the Attorney General, whose interpretation of the Voting Rights Act is entitled to considerable deference, *see, e.g.*, **United States v. Sheffield Board of Comm'rs**, 435 U.S. 110, 131, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978), has consistently interpreted § 5 to reach the annexation of vacant land intended for residential development. [FN8] Finally, Congress was aware of the Attorney General's view in this regard, and implicitly approved it, when it reenacted the Voting Rights Act in 1982. [FN9] Cf. id., at 131-135, 98 S.Ct., at 979-981.

*City of Pleasant Grove*, 479 So.2d at 467-68. Thus, *City of Pleasant Grove* dealt with the issue of preclearance and land that may be developed into a white residential subdivision. In the case sub judice, the "Winona Elevator Property" is in commercial usage with no inhabitants.

¶81.     In *City of Hattiesburg*, 840 So.2d at 93, this Court held:

We held in *Matter of Extension of Boundaries of City of Columbus*, 644 So.2d 1168, 1180 (Miss.1994), that where voting strength is in dispute, we do not afford great weight in cases where the issue is not raised by one with standing. The objectors presented no evidence of dilution nor did they offer any minority objector witnesses aggrieved by such a dilution, and the chancellor so found that the proposed annexation would have "little, if any, effect on minority voting strength."

*See also* **In the Matter of the Enlargement and Extension of the Municipal Boundaries of the City of Southaven**, 864 So.2d 912, 957 (Miss. 2004) ("The chancellor found that, since no one lived in the PAA, this factor has no relevance. We find that the chancellor's finding that this factor is neutral was not manifestly wrong and that the finding was supported by substantial and credible evidence."); **In re Enlargement and Extension of Municipal Boundaries of City of Biloxi**, 744 So.2d at 284 ("This factor should not be afforded great weight since it was not raised by an African-American."). *See also* **Prestridge v. City of Petal**, 841 So.2d 1048, 1057 (Miss. 2003).

¶82. The chancellor determined that the proposed annexation area was either vacant or in commercial use and that the anticipated usage will be for commercial or industrial purposes. Therefore, based on the fact that the area that the chancellor determined to be suitable for annexation has no residents and none anticipated in the future, there is no impact, either positively or negatively on the voting strength of a protected minority. Substantial credible evidence at the hearing supports the chancellor's finding for this indicium.

¶83. Slaughter stated that there is no adverse impact on the protected minority voting strength. The area is unlikely to have residential property on this proposed annexation area and all of the objectors in this case are white. Indeed, the "Winona Elevator Property" is a business, and no one lives on the property.

¶84. We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

## 11. Enjoyment of economic and social benefits of the municipality without paying a fair share of taxes.

¶85. The Neals claim that they rest their case on this indicium of reasonableness. They also argue that the City has failed to show any need to annex or any need for municipal services by the proposed annexation area. Further, the Neals claim that the City has failed to provide services and planning for the future, and the City has bizarre past annexations with no promises which were an attempt to avoid integration. In addition, the Neals assert that they do not enjoy any benefits from the City without paying for them, they reside in the City and pay both ad valorem taxes on real property and personal property tax, they pay county tax for any real estate owner outside the City limits, they receive water from the local water association, their property is accessed by federal Highway 51 (and they pay federal taxes) and they provide

35

jobs for city residents. Consequently, the Neals state that they are not tax dodgers, and the City should not be rewarded since it fails to provide services and planning for its citizens.

¶86.   The chancellor stated:

With regard to the "fair share" indicia the Mississippi Supreme Court made the following observation in *Columbus*: [FN 4 *Matter of Extension of Boundaries of City of Columbus*, 644 So.2d 1168, 1180 (Miss. 1994)]

> The lower court made no finding on this indicium. The value of this item as an indicator of reasonableness is questionable because it is difficult to envision a situation where an individual's "fair" share of taxes is greater than the amount required by law. Residents of the PAA pay required county taxes as well as sales taxes when they buy goods in Columbus. Fairness requires no more.

While the Court agrees that under *Columbus* the objectors pay the taxes assessed the words of the Mississippi Supreme Court in *Bassett v. Town of Taylorsville*, 542 So.2d 918, 922 (Miss. 1989) have a strong ring of similarity to the situation found on the Winona Elevator property:

> The case of Appellant/Objectors Bassett and Enamel Products is not very appealing. These two parties engage in substantial businesses just outside the current town limits. Enamel Products' Solar Hardware Division employs approximately 275 people and operates in the Industrial Park area. Bassett's Automatic Plating operation has from eighteen to twenty employees.

> The smoke screens removed, these Appellants simply do not want to pay town taxes. They claim that there is nothing Taylorsville can do for them and that they will achieve no benefits from annexation. Each would have us ignore the benefits. Taylorsville's proximity has long afforded them benefits each will continue to enjoy without regard to annexation. Each draws employees from Taylorsville, and otherwise participates in the life of the community. If the town of Taylorsville became unincorporated tomorrow and all of its residents moved away the next day, Enamel Plating and Bassett would be out of business. It is not unreasonable to suggest that what these objectors want is representation without taxation. This is hardly the stuff of which good citizens are made. Besides, the Constitution protects these parties from paying more than their fair share of taxes in the community upon annexation. See Miss. Const. § 112 (1890 as amended); U.S. Const.Amdt. XIV.

36

This factor favors the reasonableness of the proposed annexation.

¶87.    The dissent argues that the Neals are unlike the objectors in *Bassett*.  Granted  the scale of the Neals' business is smaller than that in *Bassett* and calling an objector a "tax dodger" is very harsh. Nevertheless, the cases and substantial credible evidence at the hearing supports the chancellor's finding for this indicium.  Slaughter stated that there is the cost of fire personnel and salaries.  The Neal property is less than a mile from the fire station, and the cost of providing fire protection to this property is more than what the County pays the City in reimbursements.  The "Winona Elevator Property" is surrounded on three sides by the City and a customer, traveling in either trucks or automobiles, to the grain elevator must pass through the City to access the property.  The Neals will benefit from City municipal services, as more thoroughly discussed supra.

¶88.    In addition to the increased fire protection with a new fire hydrant and police protection, the City will provide sewer and water services, increased trash services, pest control and animal control, parks and recreation areas.  The City has hired urban planners to update the comprehensive plan, make a capital improvement plan, and update City zoning.  The City also has many codes such as buildings, electric, fire, plumbing, gas, and a  litter ordinance.  The County has no planning, zoning or codes in place at all.  We find that the chancellor's findings for this indicium were supported by substantial credible evidence and were reasonable.

### 12.  Any other factors that may suggest reasonableness.

¶89.    Under this indicium the chancellor considered the impact of annexation on schools.  After giving a brief history of this indicium and citing that Miss. Code § 37-7-611 is now repealed, the chancellor found that with the precleared repeal of the code section that  "municipal annexation has no impact on school district lines."

¶90.	The Neals make no argument for this indicium of reasonableness in their brief, therefore, we need not address this issue.

## CONCLUSION

¶91.	This Court finds that under the totality of the circumstances the chancellor's findings of facts pertaining to the twelve indicia of reasonableness and the annexation of the "Winona Elevator Property" are reasonable and supported by substantial and credible evidence. Accordingly, we affirm judgment approving the annexation of the "Winona Elevator Property" located in Parcel Four of the City of Winona's ordinance of annexation.

¶92.	**AFFIRMED.**

**WALLER, P.J., CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND COBB, P.J. DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, DISSENTING:**

¶93.	It seems to me quite odd that the majority affirms, over objection, an annexation by a city which (despite two annexations in the past ten years) cannot contradict the following:

.	its population decreased by 7.6% from 1980 to 1990;

.	its population decreased by 3.9% from 1990 to 2000;

.	its county population decreased by 7.3% from 1980;

.	its county population decreased by 1.6% from 1990 to 2000;

.	it added only 37 citizens by natural increase in ten years;

.	for eleven years, it issued an average of 10 residential building permits per year;

.	for eleven years, it issued an average of 7 commercial building permits per year;

.	it has over 2,600 acres of vacant, unrestrained land available for development;

38

.      it has 573 additional acres in the 100-year flood plain available for development;

.      it has 60 acres available for industrial development.

¶94.      The Mayor of the City of Winona quite candidly exposed the true reason for this annexation effort: sales taxes. Because Winona has no need to expand its boundaries, has no path of growth, and has no purpose for the proposed annexation, other than to raise its sales tax revenue, I respectfully dissent.

¶95.      The property at issue here is Parcel Four, which was divided into two sections described as the developed "Winona Elevator Property" and the "Undeveloped Neal Property." The chancellor found that under the totality of the circumstances the annexation of the "Winona Elevator Property" was reasonable but the annexation of the "Undeveloped Neal Property" was not.

¶96.      "The[] twelve [indicia of reasonableness] factors are not separate, independent tests which are conclusive as to reasonableness." *Matter of Enlargement of Municipal Boundaries of the City of Jackson*, 691 So. 2d 978, 980 (Miss. 1997). "Rather, these factors are 'mere indicia of reasonableness.' '[T]he ultimate determination must be whether the annexation is reasonable under the totality of the circumstances.'" *Id.* (citations omitted). "**An annexation is reasonable only if it is fair**." *Id.* (emphasis added).

### 1. Need for Expansion

¶97.      Winona has no need to expand its boundaries. The trial court stated:

> Winona based its assertion on ***need for expansion***, *not on lack of vacant land to accommodate future development*, but rather *on the unique locational characteristics* of the particular parcels or property it seeks to annex. Each parcel is located at or near the intersection of major transportation corridors.
> The Objectors assert that Winona has no need to expand and thus the annexation is unreasonable. It is true that growth has been slow compared to some areas of the state. Perhaps the municipality may be wise to consider seeking judicial deletion of a number of less developed areas within the municipality. However, annexation of each of the areas

39

which are the subject of this action with one exception supports the reasonableness of the proposed annexation.

(Emphasis added).

¶98. Winona does not contend that its need for expansion is based on lack of vacant land to accommodate future development. Instead, Winona asserts that it has a need to expand into "the unique locational characteristics" of the Winona Elevator property.

¶99. In *City of Jackson*, this Court held:

> Before the City of Jackson annexes more land and residents for which it has had to extend infrastructure and provide services, it should make an effort to extend that infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas.

*Id.* at 983.

¶100. However, in the case sub judice, the chancellor did not hold that the City of Winona should make efforts to develope the vacant, developable land before annexing more land but held that "[p]erhaps the municipality may be wise to consider seeking judicial deletion of a number of less developed areas within the municipality."

¶101. The Mayor of Winona testified at trial regarding the need for the annexation:

> Q. All right. And basically, that's your testimony here today, isn't it, is you're not sure whether or not there's a need for annexation?
>
> A. Well, the need would be for sales tax purposes. That's our bread and butter, you know, to annex some areas to get more sales tax into the city.

¶102. Furthermore, James E. Butts, Alderman Ward 5, Vice-Mayor testified:

> Q. Mr. Butts, do I understand your testimony correctly to say that the main reason that you think that you want to annex or the city wants to annex this property is so it can block it up, block up the area or square it up? Was that the terminology you used?
> A. As close as possible as far as the boundaries are in the city, correct, and to some extent, yes.

40

...
Q. You just want to block up the area?

A. We want to bring –as I stated earlier, we want to bring everything within compliance as to more of a block style instead of a zigzag like we have.

¶103. In an annexation case filed by the City of Jackson, this Court held:

> There was considerable undisputed evidence presented at trial that the population of the City of Jackson is decreasing and, that although there is considerable vacant, developable land within the City, applications for both residential and commercial building permits have decreased considerably over the last few years. While it is true that this Court has allowed annexations even though there is no significant population growth and/or a relatively high percentage of undeveloped land within the existing city limits, this presence of these factors should, at the very least, be an impediment to annexation.
>
> . . .
> Although it has been held that a city's need to maintain or expand its tax base, especially as growth and development occurs on its perimeters, is a factor to be considered when determining the reasonableness of a proposed annexation . . . this Court has in the past, been very critical of annexations which are in effect 'tax grabs.'
>
> Over Ninety years ago this Court held that '[m]unicipalities are not designed for the purpose solely, nor chiefly, of raising revenue. The power of extending corporate limits is granted not to be resorted to for the purpose alone of increasing the income of the municipality.

*City of Jackson*, 691 So. 2d at 981-83. If ever there was a "tax-grab" case, this is one.

### 2. Path of Growth.

¶104. As already pointed out, Winona has no growth. Thus, how can such non-existent growth have a path? The Neal family owns the Winona Elevator property, and the family company occupies the 5.5 acre proposed annexation area.

¶105. The chancellor held:

> [T]he Court finds that each parcel is clearly immediately adjacent to the existing city. . . . Spillover growth has occurred only in the Winona Elevator Parcel. The other parcels are vacant, but with the exception of the Undeveloped Neal Parcel each appears to be prime for commercial development. Considering each of these factors each parcel appears to lie in the path of growth of the City of Winona.

41

¶106. Contrary to the chancellor's finding, I do not find support in the record for the conclusion that either parcel "appears to lie in the path of growth of the City of Winona."

### 3. Potential Health Hazards in the Area to be Annexed.

¶107. Harry Neal testified that, when he requested that his property be hooked up to the city sewer (he even offered to pay the expenses to hook it up), he was denied the services. He was then forced to put in a sewage treatment plant which, at the time, was in compliance with all state regulations. The treatment plant alarm system warns of any potential problems. Although there was testimony that the treatment plant was currently not in compliance with new Mississippi Department of Environmental Quality (DEQ) regulations, Neal testified that he would modify his system accordingly. Thus, this factor does not weigh in favor of the city.

### 4. The Municipality's Financial Ability.

¶108. The city claims it presently has the bond capacity and the cash reserves to fund the improvements offered to the proposed annexation area. These improvements include only water and sewer lines which, ironically, the city has denied to many of its current citizens for many years.

¶109. The Neals' expert, Michele Johnstone, prepared a chart which reflected the state of the City's finances. Her trial testimony included the following:

Q. And what was this chart show us?

A. This chart shows what's happened to the fund balance which I sometimes refer to as reserve interchangeably. I know that was used primarily in the other fund and not the general reserve fund here. But that there has been some dropping off of that particular fund over time starting in 1996 in my review of this, and that the city has had some deficits in the general fund and has had to go into fund balance in order to take care of those deficits over time.

Q. What was the fund balance in 1996?

A. Yes.

Q. What was it?

A. $816,250.

Q. $816,250?

A. Uh-huh.

Q. And what was it at the end of the year 2000?

A. $457, 386.

Q. And what is the general fund.

A. The general fund pays for things like police and fire and administrative costs. It does not include the water and sewer funds, utility funds.

Q. And what is the significance of this chart in regard to the City's financial ability to deliver services as promised in this – as a result of this proceeding?

A. Well, it shows that the city has not had good planning in paying for their services if they're having to do this and running a deficit each year in that. It's not – although they're still at a level where it's safe, it's not a healthy thing to continue to dip into that fund over time.

¶110. While it may be true that the city can use its cash reserves, or borrow the money, the evidence clearly established that the city has experienced deficits in its general fund for at least the past five years. During the same period, its assessed valuation has decreased. This is true, even though the city has raised its millage rate.

¶111. These trends, together with the fact that the city has steadily declined for twenty years, paint a bleak financial picture. It is apparent that the city can afford to install unneeded water and sewer lines in the proposed annexation area, only because it continues to deny these services to many of its current residents. This factor weighs against the city.

### 5. Need for Zoning and Overall Planning in the Area.

¶112.   The evidence shows that the Winona Elevator Property is industrial and is located in an industrial area. According to a city's zoning map and the hand-written notations,[6] the entire area north of the Winona Elevator Property and north of Highway 82 is zoned C-3 (commercial zoning). Therefore, the Winona Elevator Property is in conformity with the zoning which surrounds said property. Therefore, there is no need for further zoning or planning in regard to the Winona Elevator property. Thus, this factor does not favor annexation.

### 6. Municipal Services.

¶113.   There was testimony that the Winona Elevator property is not in need of any municipal services. Specifically, Johnstone testified regarding the following:

1)      The Winona Elevator property is receiving water service from the North Winona Water Association;

2)      The property has its own on-site sewage treatment facility;

3)      The city provides fire protection to the Winona Elevator property through an agreement with the city and the county;

4)      Law enforcement is provided from the Montgomery County Sheriff's Department, to which a burglar system is connected from the property;

5)      There are street lights on the Neal property;

6)      Garbage pickup is provided by the county; and

7)      The highways used by customers come from state and federally maintained highways and no street improvements are offered by the city to the Winona Elevator property.

---

[6] The 1994 zoning map introduced at trial is the most up-to-date zoning map. However, it fails to include areas annexed in 1970 and 1997, and there are *hand-written* notations of zoning classifications in areas *not shown on the map*.

The Mayor of Winona testified:

> Q. And so basically all of the Neals' property needs are met? They don't need any municipal services, do they?
>
> A. Well, I'd like to see them get a few of our services.
>
> Q. I know, but as far as what they need, isn't it fair to say they really don't need any municipal services?
>
> A. Yes, sir.

¶114. Therefore, the current services provided to the Winona Elevator property are sufficient. The city proposes to put a 6-inch water line right in front of the Winona Elevator property with a fire hydrant which would provide fire protection. However, the record reflects that the proposed annexation area has no need of additional fire protection.

¶115. "When current services are adequate, the fact that annexation may enhance municipal services should not be given much relevance . . . ." *City of Jackson*, 691 So. 2d at 984.

¶116. In my view, the chancellor erred in finding this factor favors annexation.

### 7. Natural Barriers.

¶117. The chancellor held:

> There are no natural barriers between the City of Winona and the areas it seeks to annex. This was undisputed at trial. This factor does not mitigate against the reasonableness of the proposed annexation.

The chancellor should have concluded that this factor is neutral.

### 8. Past Performance and Time Element.

¶118. After hearing clear evidence that the city has failed to provide municipal services to many of its current residents, the chancellor opined:

Though the evidence reveals that Winona has not extended all municipal services to all areas of the existing City, the ordinances under which the prior annexations took place made no such promises. This annexation is substantially smaller than prior annexations. In addition the evidence reveals that most of the services proposed are wither in place or can be accomplished with a relatively modest expenditure. The Court cannot say that the proposed annexation is unreasonable based on the past performance of the City. Given the scope of this matter, this factor is, at best neutral.

¶119. Therefore, the chancellor found that this factor does not weigh one way or the other for reasonableness of annexation. I find this to be remarkable.

¶120. In her testimony, Johnstone stated:

Q. Do you have an opinion as to whether the city's past performance and time element involved in the city's provision of services to it present residents justifies annexation in the present case?

A. Yes, I do.

Q. And what is that opinion?

A. My opinion is that the performance that I've seen does not indicate that there would be much certainty that there would be services provided to residents or businesses in the PAA based on what I've seen in terms of what the city has done with areas that it has annexed already.

As I mentioned before, some of the services that are offered to communities, to the areas that are annexed into the area, include zoning and planning, and as has been admitted on the stand, there is a possibility that there actually is no zoning out in areas that were annexed in 1970. So that service has not been provided to those residents, and, of course, the subsequent other activities of the planning commission in terms of approving things or building permits issued were obviously not checked against the zoning ordinance when those things were issued. So that service was not really provided to them either in terms of the zoning ordinance.

I mentioned that in areas of the city that there are still unpaved streets, streets that are in poor condition, other incidences of past performance that's not very positive by the city in taking care of what they already have in the city limits, and that tells me that this annexation, based on terms of past performance of the city, would not – they would not meet that requirement for good past performance.

. . .

46

Q. Yeah. What standard of past performance from a planning perspective in your opinion should a city be held to in a proceeding such as this?

A. Well, a city should be providing services equally to its residents across. I mean, that's what they say when they annex is that the people in that area will receive the services that the current citizens receive and that it should be fair and equal across the board, and that if there are going to be ordinances and programs and projects of the community, that they be enforced by the community and certainly in terms of the zoning map and ordinance and not knowing whether or not it's actually in place for the city for those residents. They've gone 32 years without this service, but yet it's being said the service needs to be somewhere in another area. I would say the standard would be certainly the expectation of municipal residents for the kinds of services that are urban services for a community. City water is not being provided to –

Q. Okay.

A. – to lots of residents.

Q. Let me ask you this. If you had to characterize the city's past performance in – the City of Winona's past performance as we sit here today in providing municipal services, would you characterize it as excellent, goo, average, poor, nonexistent?

A. Poor to fair, and if I can footnote that, I guess, a little bit. There's been some testimony about these areas are out there and it's too expensive to provide sewer to that area and too expensive to do this and can't do that, but cities know what they're doing when they annex. They know what they're getting. . . .

¶121. The chancellor held that "the evidence reveals that Winona has not extended all municipal services to all areas of the existing City, the ordinances under which the prior annexations took place made no such promises."

¶122. The 1990 annexation specifically stated what improvements or services the City would provide, based on requests by residents and on a share basis (*e.g.* 50/50 for sewer lines and pumping stations and 1/3, 1/3, 1/3 for paving streets), to the annexed area and there was testimony stating that the city has not been faced with any requests for improvements by any residents.

47

¶123.   The *1970*  annexation ordinance specifically stated : "No improvements will be made by the City of Winona in the territory proposed to be annexed *at the present time*."   The hearing on the case sub judice was held in February, 2002 (32 years later).  There was evidence that improvements still have not been made.  At what point in time is its past "at the present time"?  There are areas that have not been provided various services to for over 32 years but the city has adopted a 5 year plan to provide services to the Winona Elevator property, a parcel that is already provided with adequate services.

¶124. I find that this factor is not "at best neutral" but is a factor that disfavors annexation.

## 9.  Impact or Other Impact on residents and Property Owners.

¶125. The chancellor held:

> With the exception of the Undeveloped Neal Parcel, the property owners will receive value upon annexation.  This is particularly true of the Winona Elevator Property.  Upon annexation the City proposes a substantial expenditure to provide municipal utility services to this property.  These improvements will include upgrading the water supply to afford municipal level fire protection.  Additionally the Winona Elevator Parcel will receive all other municipal services.  The City of Winona has demonstrated through plans and testimony, that all areas, except the Undeveloped Neal Parcel, will receive something of value in return for the taxes to be collected.

¶126. The chancellor held that the Winona Elevator Property will receive an upgrade in the water supply to afford municipal level fire protection and it will receive all other municipal services.  There was evidence that the Winona Elevator Property is already provided with adequate services.

¶127.   The chancellor evaluated this factor the same as he evaluated the **Municipal Services** factor - strictly on municipal services.  I find this is giving double weight to municipal services; however, in the case sub judice it makes little difference because "[w]hen current services are adequate, the fact that annexation may enhance municipal services should not be given much relevance . . . ." *City of Jackson*, 691 So. 2d at 984.

¶128.   Therefore, I believe the chancellor erred in finding this factor favors annexation, when the Winona Elevator property is already provided with adequate services.

### 10.   Impact upon the Voting Strength.

¶129. The chancellor concluded that "[b]ased upon the fact that there are no residents in the area and none are reasonably anticipated, the annexation will not have an impact, positive or negative, on the voting strength of a protected minority."  I agree.

### 11.   Economic and Social Benefits to Proposed Annexation Residents.

¶130.   The chancellor held that this factor favors the reasonableness of the proposed annexation. He found persuasive the words of this Court in *Bassett v. Town of Taylorsville*, 542 So. 2d 918, 922 (Miss. 1989), finding a "strong ring of similarity" to the situation found on the Winona Elevator property. However, the following language from *Bassett* shows that it is easily distinguished from the case sub judice.

> Enamel Products' Solar Hardware Division employs approximately 275 people and operates in the Industrial Park area.  Bassett's Automatic Plating operation has from eighteen to twenty employees.
>       The smoke screen removed, these Appellants simply do not want to pay town taxes.  They claim that there is nothing Taylorsville can do for them and that they will achieve no benefits from annexation.  Each would have us ignore the benefits. . . . Each draws employees from Taylorsville, and otherwise participants in the life of the community. If the town of Taylorsville became unincorporated tomorrow and all of its residents moved away the next day, Enamel Plating and Bassett would be out of business.

*Id*.

¶131.   In the case sub judice, it is simply not so.  The Winona Elevator property is owned by the Neals' family.  It is occupied by the Neal's family business. There was testimony that the Neals have 5 employees who live in the town, not including Mrs. Neal.  The Winona Elevator Company serves farmers who have no connection with the City of Winona and processes their grain though the elevators.

49

## 12. Any Other Factors that May Suggest Reasonableness vel non.

¶132.   As the majority stated, "the chancellor found that with the precleared repeal of [Miss. Code § 37-7-611] that 'municipal annexation has no impact on school district lines'".  Therefore, the chancellor discussed no other factors that may suggest reasonableness vel non.

¶133.   I find that the case sub judice is analogous to *City of Jackson*, wherein this Court concluded by stating:

> This is a case in which the annexing municipality has a declining population and decreasing development, and the City all but admits that it is simply making a 'tax grab.'  Furthermore, Jackson failed to produce a single resident or landowner of the proposed annexation are who favored annexation. . . . All these and other factors have a significant bearing on the reasonableness of the proposed annexation, and we find that at this time the City of Jackson's proposed annexation is unfair to the residents of the proposed annexation area and fails to meet the test of reasonableness.

*City of Jackson*, 691 So. 2d at 987-88.

¶134.   For the reasons stated, I find that the annexation of the Winona Elevator Property is not reasonable under the totality of the circumstances, is not fair, pursuant to *City of Jackson*, to the owner of the Winona Elevator Property and is not supported by substantial and credible evidence.  Therefore, I would reverse and render the judgment below.

**SMITH, C.J., AND COBB, P.J., JOIN THIS OPINION**.

50